**In re BOEING SECURITIES LITIGATION.**

**This Document Relates to all Cases.**

**No. C97–1715Z.**

United States District Court, W.D. Washington.

Sept. 8, 1998.

## ORDER

ZILLY, District Judge.

THIS MATTER comes before the Court on the motion of defendants The Boeing Company, Philip M. Condit, Boyd E. Givan, and Ronald Woodard to dismiss plaintiffs' Consolidated Complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) (docket no. 67). The Court, having considered the defendants' motion and all pleadings filed in support of and in opposition to that motion, and having heard oral argument on August 5, 1998, hereby GRANTS in part and DENIES in part the motion to dismiss.

## SUMMARY OF DECISION

On July 21, 1997, Boeing announced sales of $9.3 billion and net earnings of $399 million, or $.55 per share, for the second quarter of 1997. A mere three months later, at the end of the third quarter of 1997, Boeing announced that it would suffer a net loss of $696 million, or $.72 per share, as a result of a $1.6 billion pre-tax charge related to production inefficiencies in its commercial aircraft programs. The plaintiffs, purchasers of Boeing securities during this period, allege that Boeing and the individual defendants concealed at the end of the second quarter and thereafter the true nature and extent of the Company's production problems in order not to jeopardize Boeing's pending merger with McDonnell Douglas. Plaintiffs allege that it was not until after the merger was finalized that Boeing disclosed the magnitude of its production problems and resultant losses.

Plaintiffs allege that although the defendants knew during the Class Period[1] that Boeing's production problems were serious and unmanageable, they continued to issue optimistic statements about Boeing's financial health and ability to meet unprecedented production demands. Plaintiffs note that as late as October 3, 1997, Boeing made statements that penalties for late deliveries would be "minor," that there would be no change in the company's forecast of aircraft deliveries for 1998, and that Boeing's long term profitability would be unaffected by production problems. Just three weeks after these statements were made, however, the Company admitted that "unplanned and abnormal production inefficiencies and late-delivery costs" would cause third quarter earnings to be reduced by a staggering $1.6 billion. According to plaintiffs, the stark contrast between these two statements, issued only three weeks apart, illustrates the extent to which the Company downplayed its production troubles during the Class Period.

The defendants strongly deny that they engaged in any wrongdoing or intended to mislead investors in any way. They move to dismiss the plaintiffs' claims of securities fraud, arguing that plaintiffs have failed to meet the pleading standards of the Private Securities Litigation Reform Act and Fed.R.Civ.P 9(b). In considering whether to grant a motion to dismiss for failure to plead fraud with particularity, the Court must accept the plaintiffs' allegations as true and construe all allegations in the complaint in the light most favorable to the plaintiffs. The complaint cannot be dismissed unless plaintiffs could prove no set of facts in support of their claim that would entitle them to relief.

Applying these principles, the Court denies the defendants' motion to dismiss plaintiffs' claims that certain statements, press releases, and financial statements[2]

---

1. The Class Period alleged in the Consolidated Complaint is the period between July 21, 1997 and October 22, 1997.

2. The press releases at issue here are those dated July 21, August 27, September 15, and October 3 of 1997. Plaintiffs also allege that Boeing's second quarter Form 10–Q was misleading, and that certain individual defendants made misleading statements on August 13 and October 3, 1997.

issued by Boeing in 1997 were false and misleading. Plaintiffs have alleged sufficient facts to avoid dismissal of these claims. The Court grants, however, the motion to dismiss the plaintiffs' claims of accounting fraud. Plaintiffs' accounting fraud allegations lack specificity and fail to demonstrate that Boeing's decision to recognize certain losses and costs in the third quarter, rather than the second quarter, of 1997 was part of a scheme to defraud investors rather than an exercise of business judgment.

Because this is a motion challenging the legal sufficiency of plaintiffs' complaint, the Court makes no determination as to the truth of the plaintiffs' allegations or the merits of their claims.

## BACKGROUND

The Class Plaintiffs are persons or entities who purchased or otherwise acquired the securities of The Boeing Company ("Boeing") between July 21, 1997 and October 22, 1997 (the "Class Period"). The gist of the plaintiffs' complaint is that during the Class Period Boeing misrepresented, or omitted material facts concerning, the extent of its production problems in an effort to ensure that McDonnell Douglas shareholders would approve a proposed merger with Boeing. Plaintiffs allege that Boeing represented its production problems to be minor and manageable, but in fact they were serious, extensive, and persistent. *See* Consolidated Complaint at ¶¶ 60 – 94, 101 – 103, 150 – 154. The plaintiffs also allege that the second quarter financial statements were materially misleading in that Boeing "failed to make a provision for losses on contracts resulting from the company's widespread production inefficiencies in accordance with GAAP [generally accepted accounting principles] and Boeing's own program accounting method." See Complaint at ¶¶ 121 – 128.

The Class Period commences with Boeing's July 21, 1997 announcement of sec-

**3.** All references to Exhibits are to exhibits attached to Defendants' Appendix unless oth-

ond quarter results. *See* July 21, 1997 Press Release, Exh. 2 to Defendants' Appendix.[3] Boeing noted in that press release that the company's ramp up in production had resulted in out of sequence work, but stated that progress continued to be made in developing systems to improve efficiency and reduce cycle times. Ex. 2 to Defendants' Appendix at 2. Plaintiffs allege that this statement was false and misleading in that Boeing knew that (1) it would suffer material overruns, penalties and losses on certain commercial aircraft contracts due to persistent production problems; and (2) it was plagued with persistent production flaws, parts shortages, and a variety of labor problems, which would materially impair Boeing's production schedule and create a high probability of large losses to the company.

Other statements the plaintiffs allege are materially false and misleading include (1) statements made by Phil Condit to analysts on August 13, 1997, Ex. 30; (2) statements in Boeing's second quarter 10–Q filed on August 14, 1997, Ex. 14; (3) Boeing's August 27, 1997 press release, Ex. 3; (4) Boeing's September 15, 1997 press release, Ex. 4; (5) Boeing's October 3, 1997 press release, Ex. 5.; and (6) statements made by Woodard to analysts on October 3, 1997, Ex. 33.

The Complaint describes in detail the various production problems the plaintiffs allege make Boeing's statements during the Class Period misleading. According to plaintiffs, Boeing failed to disclose, among other things, that:

(1) contracts had been bid at dangerously low margins resulting from sharp discounts as high as 35%, *see* Complaint at ¶ 107(a), p. 43;

(2) production and manufacture of its airliners were plagued with serious deficiencies stemming from persistent production flaws, *see* Complaint at ¶ 107(b), p. 43;

erwise noted.

(3) the chronic failure to order parts often resulted in 30% of the parts not being ordered, see Complaint at 107(d), p. 44;

(4) internal visibility reports grossly underreported the number of missing parts due to corporate procedures, often by more than 50%, and the SMART database provided a more accurate count showing thousands more shortages throughout the Class Period; ¶ 107(e);

(5) as reported to Boeing by its own special team reviewing the production and procurement problems, persistent problems in the part supply could not be remedied in time to prevent huge losses, see 107(f) at 44;

(6) behind schedule work vastly exceeded both budgeted and manageable amounts, see 107(*l*) at 45;[4]

(7) shortages so increased costs that they pushed Boeing's airline production contracts into the red by hundreds of millions of dollars; see 107(*o*) at 47;

(8) overtime was at twice the ceiling (12%) allowed in Boeing's production plans; see 107(p) at 47; and

(9) Boeing was facing huge penalties and contract concessions due to late deliveries; see 107(t) at 48.

Boeing now moves, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss all of plaintiffs' claims, arguing that plaintiffs' allegations fail to state a claim for securities fraud.

## DISCUSSION

### I. Standard under Rule 12(b)(6)

Courts grant Rule 12(b)(6) relief only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts the support a cognizable legal theory. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The defect in plaintiff's claim must appear on the face of the complaint. The court cannot consider material outside the complaint, such as facts presented in briefs, affidavits or discovery materials. *McCalden v. California Library Assoc.*, 955 F.2d 1214, 1219 (9th Cir.1990), *cert. denied*, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992). The court may consider, however, documents attached to the parties' papers which have been referred to in the complaint. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.), *cert. denied*, 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994). The court may also consider any matter that is subject to judicial notice, such as public records. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986). Thus, the Court may take judicial notice of all of the defendants' filings with the Securities Exchange Commission during relevant periods.

When ruling on a motion to dismiss, courts must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them, and the court must construe the allegations in the complaint in the light most favorable to the plaintiffs. *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898

---

**4.** Plaintiffs allege that defendants knew that jobs required to complete production of 737 and 747 aircraft were falling behind schedule in amounts so large that deficits and delays were materially impairing the production schedule. Whereas Boeing's figure for a manageable number of jobs was 3,000, and behind schedule jobs were expected to run between 0 and 1000, Boeing's database showed that by June 6, 1997, the 737 program was 4,300 jobs behind, and the 747 program was 12,875 jobs behind. By July 1, the 737 program was 5,600 jobs behind, but the 747 program had improved and was 9,600 jobs behind. By August 15, 1997, the 737 program was 6,700 jobs behind schedule, and the 747 program had fallen behind again and was at 12,500 jobs behind schedule. As of October 1, 1997, the 737 program was 8,400 jobs behind schedule and the 747 program was 14,276 jobs behind schedule. *See* Complaint at ¶ 107(*l*). Plaintiffs note that despite these serious production problems, Ron Woodard stated on October 3 that penalties for late aircraft would be "minor," there would be no change in Boeing's forecast of 480 aircraft deliveries in 1998, and Boeing's long-term profitability would be unaffected. Ex. 33.

(9th Cir.1986). A complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

II. *Heightened Pleading Standards of Rule 9(b) and the PSLRA*

Rule 9(b) states that in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity. Fed.R.Civ.P. 9(b). In 1995, Congress passed the Private Securities Litigation Reform Act (PSLRA), which created a heightened pleading standard for claims of securities fraud.

■ The PSLRA, codified at 15 U.S.C. § 78u–4, provides that in any private action in which the plaintiff alleges that the defendant made an untrue statement of material fact or omitted to state a material fact, the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, a plaintiff must attribute the misleading statements upon on which his claim is based to a particular defendant. In other words, "the plaintiff is 'obligated to distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud.'" *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 752 (N.D.Cal.1997) (quoting *Erickson v. Kiddie,* 1986 WL 544, *7 (N.D.Cal.1986)).

The PSLRA further provides that

In any private action arising under this chapter in which the defendant may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a ***strong in-***

***ference that the defendant acted with the required state of mind.***

15 U.S.C. § 78u–4(b)(2) (emphasis added). If the plaintiff fails to satisfy the PSLRA's heightened pleading requirements, the Court must dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

■ Defendants argue that the heightened pleading standards of Rule 9(b) and the PSLRA have made Rule 12(b)(6) standards inapplicable to securities fraud cases. The Court rejects this argument. While the plaintiffs must plead fraud with specificity under Rule 9(b) and meet the standards set forth in the PSLRA, there is no basis for concluding that the court, in evaluating the sufficiency of the plaintiffs' complaint, need not accept plaintiffs' allegations as true, draw all reasonable inferences in their favor, and construe the complaint in the light most favorable to the plaintiffs. A review of recent cases reveals that courts still apply Rule 12(b)(6) principles to motions to dismiss securities class action cases. *See, e.g., Allison v. Brooktree Corp.,* 999 F.Supp. 1342 (S.D.Cal.1998); *In re Stratosphere Corporation Securities Litig.,* 1997 WL 581032 (D.Nev.1997); *Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.,* 999 F.Supp. 725 (S.D.N.Y.1998); *Walish v. Leverage Group, Inc.,* 1998 WL 314644 (E.D.Pa. 1998); *In re Summit Medical Systems, Inc.,* 10 F.Supp.2d 1068 (D.Minn.1998).

III. *Section 10(b) Liability*

To prevail on a securities fraud claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b–5, plaintiffs must prove: (1) that defendants made a false statement or failed to disclose information that rendered another statement misleading; (2) that such statement or omission was material; (3) that plaintiffs relied on the statement or omission; and (4) that defendants acted with scienter or

an intent to defraud. *Monroe v. Hughes,* 31 F.3d 772, 776 (9th Cir.1994).

There is no liability under section 10(b) and Rule 10b–5 unless there was a duty to disclose. Thus, "silence is not misleading in the absence of a duty to disclose." *In re VeriFone Sec. Litig.,* 784 F.Supp. 1471, 1480 (N.D.Cal.1992), *aff'd,* 11 F.3d 865 (9th Cir.1993). If a company chooses to reveal relevant, material information even though it had no duty to do so, however, there is a duty to make the disclosure complete and accurate. *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir.1987) (citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860–61 (2nd Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)). Complete and accurate disclosure does not require a company that reveals one fact to reveal all others that would be of interest to investors. Rather, the company must reveal only such other facts, if any, "that are needed so that what was revealed would not be 'so incomplete as to mislead.'" *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990) (quoting *Texas Gulf Sulphur,* 401 F.2d at 862).

## IV. *Defendant's Arguments in Support of Dismissal*

The defendants make four primary arguments in support of their motion to dismiss: (1) the alleged misrepresentations in the July 21 press release and second quarter 10–Q are forward-looking statements that are protected by the safe harbor provision of PSLRA; (2) all other alleged misrepresentations were accompanied by meaningful and specific cautionary disclosures, thereby precluding liability under the "bespeaks caution" doctrine; (3) the plaintiffs have failed to adequately plead scienter; and (4) plaintiffs fail to state a claim for accounting fraud. Each of these arguments is addressed in turn.

### A. *Safe Harbor*

The PSLRA creates a safe harbor for forward-looking statements. A forward-looking statement is defined as a statement containing a projection of financial items, a description of management's plans and objectives for future operations or future financial performance, as well as "any statement of the assumptions underlying or relating to any·[forward-looking] statement." 15 U.S.C. § 78u–5(i)(1). Pursuant to 15 U.S.C. § 78u–5(c)(1), a forward-looking statement cannot as a matter of law be the basis for liability under section 10(b) if the forward-looking statement is

> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement; or
>
> (ii) [is] immaterial; or

(B) the plaintiff fails to prove that the forward looking statement—

> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false and misleading; or
>
> (ii) if made by a business entity, was—

\* \* \* \* \* \*

> (II) made or approved by [an executive officer] with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1). Thus, the statute provides that a forward-looking statement cannot be the basis for 10(b) liability if either the forward-looking statement is accompanied by ***meaningful cautionary language, or*** the plaintiff fails to prove that the person making the statement made it with ***actual knowledge*** that the statement was false and misleading.

### 1. *Statements Defendants Contend Are Protected By Safe Harbor*

Defendants argue that the July 21, 1997 press release and the Form 10–Q for the second quarter of 1997 are immune from liability under the safe harbor for forward-looking statements.

#### a. *July 21 Press Release*

The July 21 press release provides:

[T]he rapid production rate buildup has resulted in a substantial increase in employment, material, and fabrication demand at the Company and its suppliers. Skill training requirements and parts shortages have created out-of-sequence work at Company facilities and at supplier locations. Overtime in engineering and production areas continues at high levels. As a result, the commercial aircraft business is experiencing a near-term decline in productivity. For the longer term, progress continues to be made in developing and implementing design and production systems to improve efficiency and reduce cycle times. Ex. 2.

### Near–Term Decline in Productivity

■ The first statement alleged to be covered by the safe harbor provides that Boeing *"is experiencing a near-term* decline in productivity." The "near-term" part of this statement suggests that Boeing will experience a short term decline in productivity, but the "is experiencing" part of the statement indicates it is already happening. The statement is ambiguous, and it is not clear if the statement is a present fact, or forward-looking, or both. To the extent Boeing is projecting a near term decline in productivity, that part of the statement is forward-looking.

The safe harbor provisions of the PSLRA require the court to consider whether any forward-looking statement "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement." 15 U.S.C. § 78u–5(c)(1). In this case, the question is whether Boeing's statement contained meaningful cautionary language concerning factors that could cause the decline in productivity to be substantially worse than described or to last substantially longer than expected.

Boeing explained in the press release that there had been a rapid production buildup which had resulted in a substantial increase in employment, material and fabrication demand at the company and its suppliers; that parts shortages and skill training requirements caused out of sequence work; and that overtime was at high levels, resulting in a decline in productivity. These statements merely describe the cause of the Company's then-current production problems. There is no language in the press release that warns investors of factors that could cause a steeper decline in the Company's productivity or an extension of that period of inefficiency.[5]

### Longer Term Progress

■ The statement that "longer term progress continues to be made in developing and implementing systems to improve efficiency" has both forward-looking and present tense components. The statement indicates that progress was being made with respect to finding solutions to production problems, and the Company expected that progress would continue to be made in the future.

Boeing argues that this projection was accompanied by meaningful cautionary statements, including: (1) the statements in the release itself which describe Boeing's current problems with productivity, (2) the language in the press release which gives a standard warning about forward-looking statements, (3) the statement in the release that margins for the balance of 1997 are expected to be lower, and will be impacted by increased pricing pressure and near term production problems associated with increased commercial aircraft rates, and (4) cautionary statements in its 1996 annual report and Form 10–Q for the first quarter of 1997, which Boeing incor-

---

5. Although the Company need not include all possible risk factors, the factors identified should be of such a nature that they could cause a result materially different from that in the forward-looking statement. Here, there were no meaningful cautionary statements advising investors of factors that could cause a result materially different from that in the forward-looking statement.

porated by reference into the press release.

In order to be meaningful, cautionary statements must identify "important factors that could cause actual results to differ materially from *those in the forward looking statement.*" 78 U.S.C. § 78u–5(c)(1)(A)(i) (emphasis added). Thus, the cautionary statements must at least identify factors that could have a bearing on the matter addressed in the forward-looking statement. Here, the forward-looking statement is that the company was making progress in designing systems to improve efficiency and reduce cycle times. Many of the warnings identified by the defendants, particularly the boiler plate warning in the warnings section of the press release and the warnings in the annual report and first quarter 10–Q, do not speak to factors that could adversely affect the company's development of systems to improve efficiency. Rather, they speak to overall production problems and an expectation that margins would be lower as a result of the production problems. Boeing identified no factors that would caution investors that results might be materially different from those described in the forward-looking statement. Thus, the statement in the July 21 press release concerning Boeing's "long term progress ... in developing and implementing systems to improve efficiency" is not protected by the safe harbor provision of the PSLRA.

### Current Production Problems

■ Defendants argue that the statements in the July 21 press release describing Boeing's then current production problems are covered by the safe harbor because they are assumptions underlying their forward-looking statements. The Court rejects this argument. Assumptions entitled to safe harbor protection must be just that: assumptions underlying projections and expectations. The statements at issue here, which concern present production problems, are not assumptions, they are present facts. To interpret the safe harbor protection of underlying assumptions in the manner suggested by the defendants would allow the exception to swallow the rule. Virtually any factual assertion by a business entity would be subject to safe harbor protection.

The defendants also offer case authority providing that certain statements stated in the present tense can in fact be forward-looking and entitled to forward-looking statement protection. These cases are inapposite. The significance of the cases cited by the defendants is that sometimes statements made using the present tense are in fact statements of "futurity and concurrence," and are therefore forward-looking. *See, e.g., Anderson v. Clow,* 1994 WL 525256, *8 (S.D.Cal.1994), *aff'd, In re Stac Electronics Sec. Litig.,* 89 F.3d 1399 (9th Cir.1996). Such statements would include those such as "we believe our unique challenges are behind us," or "sales are already softening and we are entering a period of adversity." The forward-looking tenor of such statements is obvious. The statements made here concerning Boeing's current production problems are not of the same character.

#### b. *Second Quarter 10–Q*

The statements in the second quarter 10–Q, ex. 14, mirror those in the press release and thus the same analysis applies. Boeing's projections concerning near -term decline in productivity and long-term progress have forward-looking components that are subject to safe harbor protection provided they are accompanied by meaningful cautionary statements. The boilerplate warnings in the 10–Q are not meaningful cautionary statements. The statements concerning expected increases in production, the need to adjust production rates in the future, and problems with the ramp up in production are cautionary, but do not address factors that could adversely affect Boeing's plans to improve production in the future.

### B. *"Bespeaks Caution" Doctrine*

■ The "bespeaks caution" doctrine provides a mechanism by which a court can rule as a matter of law that defen-

dants' forward-looking representations "contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *In re Worlds of Wonder Sec. Litig.* (WOW), 35 F.3d 1407, 1413 (9th Cir.1994) (citation omitted), *cert. denied,* 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995). The bespeaks caution doctrine "applies only to precise cautionary language which addresses itself to future projections, estimates or forecasts...." *Id.* at 1414 (quoting district court in *WOW,* 814 F.Supp. 850, 858 (N.D.Cal.1993). Thus, the doctrine does not apply to statements of present fact.

▮ The "bespeaks caution" doctrine is applied narrowly because an overbroad interpretation would encourage management to conceal deliberate misrepresentations beneath the mantle of broad cautionary language. *Id.* In addition, the Ninth Circuit has held that courts may dismiss claims based on the "bespeaks caution" doctrine only when the documents containing defendants' challenged statements include " 'enough cautionary language or risk disclosure,' that reasonable minds could not disagree that the challenged statements were not misleading." *Fecht v. Price,* 70 F.3d 1078, 1082 (9th Cir.1995) (quoting *WOW,* 35 F.3d at 1413), *cert. denied,* 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996). The PSLRA's safe harbor provisions do not supplant the "bespeaks caution" doctrine.[6]

Defendants argue that the forward-looking statements to analysts on August 13, and the press releases of August 27, September 15, and October 3 are protected by the "bespeaks caution" doctrine. Each of these statements will be addressed in turn.

On August 13, 1997, Paine Webber reported that Phil Condit stated that "the doubling of commercial aircraft production over an eighteen-month period has led to

'out of sequence' work but the problems have leveled out, and should be improving over the next six months." Ex. 30. The Court concludes that this statement is not protected by the "bespeaks caution" doctrine. Under Ninth Circuit law, the Court must consider whether there was enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statement was not misleading. That test is not satisfied.

Defendants point to the heading above Condit's statement, which states "INEFFICIENCIES 'FOR REAL' AND SHOULD CONTINUE THROUGHOUT 1997," and to Paine Webber's statement that "[a] continuing depressed pricing environment and inefficient ramp up of new deliveries could-limit Boeing's attempt to capitalize on the upturn in the commercial aircraft cycle." The first problem with Boeing's position is that the cautionary language appears to be Paine Webber's; it does not appear that Condit made any particular cautionary statements along with his statement about the leveling out of out-of-sequence work. Even if the Court attributes such cautionary language to Boeing, however, the "bespeaks caution" doctrine still would not apply. Condit's statement indicates that production problems have leveled out and should be improving over the next six months. If the court accepts as true plaintiffs' allegations that production was in fact "out of control" at this time and that parts problems could not be remedied,[7] then reasonable minds could certainly differ as to whether there was sufficient cautionary language in Condit's statement to make it not misleading.

The August 27 press release, Ex. 3, provides that as a result of increased airplane orders, Boeing "is aggressively planning to address the challenges of an extremely demanding production schedule."

---

**6.** The Explanatory Statement of the Committee of Conference (the "Statement of Managers") provides that that "[t]he Conference Committee does not intend for the safe harbor to replace the judicial 'bespeaks caution' doctrine or to foreclose further development of that doctrine by the courts." Conf.Rep. at 46.

**7.** *See* Consolidated Complaint at ¶ 116(a) through (v).

The release also states that "Boeing airplane production is experiencing rate increases in a fast-paced market that is demanding it increase rates twice as rapidly as in comparable periods in the past. This overwhelming success, however, is taxing the industry's capacity."

Ron Woodard, Boeing Commercial Airplane Group President, said that "Our challenge is to deliver these airplanes on schedule as promised." The press release added:

"Boeing has analyzed all options and developed a strategic plan to minimize the impact to its schedule of committed deliveries. Part of that plan includes temporarily assigning some employees from the 767 production line to work on the 747 line.... In addition to temporarily assigning employees, the company is exploring options that would permit it to bring in additional resources, implementing new manufacturing and business processes, providing additional training, adjusting internal work schedules, and other options that will help streamline production, eliminate waste and cut costs."

Exh. 3.

■ The essence of this statement is that Boeing has developed and will be implementing a plan to meet its production needs. The defendants contend that this statement is covered by the "bespeaks caution" doctrine because Boeing introduced its statement by explaining that it was "aggressively planning to address the challenges of meeting an extremely demanding production schedule." Again, the Court is unable to conclude at this time that this statement bespoke caution to an extent that it was not misleading as a matter of law. While it is true that the Company acknowledged production problems and specific difficulties with the ramp up, the statement suggests that Boeing had developed a plan to handle and resolve these problems. If the Court accepts as true plaintiffs' allegations concerning the magnitude and unmanageability of Boeing's productions problems,[8] then the Court cannot find as a matter of law that the statement bespoke enough caution so that the statement was not misleading.

The same analysis applies to the September 15 and October 3 press releases (Exs. 4 and 5, respectively), in which Boeing announced a delay in delivery of twelve aircraft (Sept. 15) and the next steps in its aggressive production recovery plan (Oct. 3). The Company continued to refer to production problems, including parts shortages, and advised the public that it would be taking some significant steps to correct its problems, including shutting down the 747 line for 20 days. Given plaintiffs' allegations, which the Court must accept as true for purposes of this motion, the adequacy of these warnings is a question of fact.

■ Boeing argues that the Court must also consider disclosures and warnings made outside these statements in determining whether the Company "bespoke caution."[9] Even if the Court considers all the warnings identified by the defendants, the Court still cannot rule as a matter of law that these warnings were sufficient so as not to make the other statements misleading, given the circumstances identified by the plaintiffs in their complaint.

8. *See* Consolidated Complaint at ¶ 131(a) through (v).

9. Boeing refers the Court to warnings made in various public filings and reported in newspaper articles, such as a Wall Street Journal article dated June 26, 1997, Ex. 35. The Court takes judicial notice of the warnings in Boeing's SEC filings. Although Courts may sometimes take judicial notice of newspaper articles, *see Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 458 (9th Cir.1995), such materials are not properly considered on a motion to dismiss. The defendants argue that the PSLRA requires courts to consider any statements identified by the defendants in their moving papers as meaningful cautionary statements. *See* 15 U.S.C. § 78u–5(e). To the extent the Court must consider these materials, it need do so only in connection with determining whether the safe harbor provisions of the PSLRA apply.

In conclusion, the Ninth Circuit has held that the bespeaks caution doctrine should be applied narrowly, and courts should dismiss claims based on the bespeaks caution doctrine only where documents containing defendants' challenged statements include enough cautionary language that reasonable minds could not disagree that the challenged statements were not misleading. The Court can make no such finding here with respect to the August 13 statement, and the August 27, September 15, and October 3 press releases.

## C. *Scienter*

Section 78u–4(b)(2) of the PSLRA provides that the plaintiff must plead sufficient facts giving rise to a strong inference that the defendant acted with "the required state of mind." The statute does not specify what the required state of mind is. It has long been established, however, that scienter, which is the state of mind required for a section 10(b) violation, is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). Courts have held, prior to the enactment of the PSLRA, that recklessness can constitute scienter under section 10(b). *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569–70 (9th Cir. 1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). Recklessness involves not merely simple or inexcusable negligence, but "an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Software Toolworks, Inc.*, 50 F.3d 615, 626 (9th Cir.1994), *cert. denied*, 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). The proof of scienter in fraud cases is often a matter of inference from circumstantial evidence. *Id.* at 627.

▬ Some courts have held that the PSLRA eliminated recklessness as a basis for section 10(b) liability. *See, e.g., Norwood Venture Corp. v. Converse Inc.*, 959 F.Supp. 205, 208–09 (S.D.N.Y.1997); *Voit v. Wonderware Corp.*, 977 F.Supp. 363, 373–74 (E.D.Pa.1997). Other courts have held that Congress, in referring only to the "required state of mind," made no changes to the state of mind required for section 10(b) liability. *See, e.g., In re Health Management, Inc. Sec. Litig.*, 970 F.Supp. 192 (E.D.N.Y.1997); *Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1320 (E.D.Wash.1998). This Court, having considered the statutory language itself, the legislative history of the PSLRA, and case law addressing the PSLRA's pleading standards, concludes that the PSLRA did not eliminate recklessness as a basis for section 10(b) liability. The legislative history is clear, however, that Congress did intend to heighten existing pleading standards for scienter.

The interpretation of a statutory provision must begin with the plain meaning of its language. *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 557, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). Where statutory language is unambiguous, the judicial inquiry is complete. *Connecticut National Bank v. Germain*, 503 U.S. 249, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). The Ninth Circuit has held, however, that "[u]nder the established approach to statutory interpretation, we rely on plain language in the first instance, but always look to legislative history in order to determine whether there is a clear indication of contrary intent." *Flores–Arellano v. I.N.S.*, 5 F.3d 360, 363 (9th Cir.1993). In order to disregard the plain meaning of a statute, however, the court would have to find that applying the plain meaning would be absurd. *Id.*

Here, the statute provides that plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." The statute does not define or expand upon either the terms "strong inference" or "required state of mind." Thus, in interpreting what "strong inference" means or what the "required state of mind" is, the Court looks to legislative history for guidance.

The Senate Committee Report [10] on the PSLRA provides:

> The Committee does not adopt a new and untested pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modeled upon the pleading standard of the Second Circuit. Regarded as the most stringent pleading standard, the Second Circuit requires that plaintiff plead facts that give rise to a "strong inference" of defendant's fraudulent intent. *The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.*

Senate Report No. 104–98 at 15 (1995 U.S.C.A.A.N. 679, 694) (emphasis added). Under the stringent Second Circuit standard referred to by the Senate, a plaintiff could plead scienter by either: (1) alleging facts showing that the defendants had both motive and opportunity to commit fraud, or (2) alleging facts that constituted strong circumstantial evidence of conscious misbehavior or recklessness. *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 268–69 (2d Cir.1993), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).

The Statement of Managers [11] explains that the heightened pleading standard of the PSLRA is based in part on the pleading standard of the Second Circuit, but "[b]ecause the Conference Committee intends to strengthen existing pleading requirements, *it does not intend to codify the Second Circuit's case law interpreting this pleading standard.*" Conf.Rep. at 41 (emphasis added). In footnote 23 to that statement, the managers state that "[f]or this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness."

Footnote 23 states only that Congress chose not to include language concerning motive, opportunity, and recklessness in its pleading standard. There is nothing in the legislative history to suggest that Congress intended to eliminate recklessness as a basis for 10(b) liability.[12] There is little doubt that "when Congress wishes to supplant a judicially-created rule it knows how to do so, and in the body of the statute." *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1311 (C.D.Cal.1996).

Although Congress did not alter the standards for section 10(b) liability, it did place additional burdens on the plaintiff at the pleading stage. The legislative history makes clear that Congress intended to adopt a pleading standard for scienter that was stricter than that in the Second Circuit. What Congress failed to do, however, was specify what that pleading standard should be.[13]

---

10. The Senate Report is the report of the Committee on Banking, Housing and Urban Affairs on S.240, introduced in the Senate as the "Private Securities Litigation Reform Act of 1995."

11. The "Statement of Managers," which is part of House Conference Report No. 104–369 (referred to in this Order as "Conf.Rep."), is the joint explanatory statement by "the managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R.1058) to reform Federal securities litigation." 1995 U.S.C.A.A.N. at 730.

12. In the current session of Congress, legislation has been introduced to adopt uniform standards for 10(b) liability. During debates on this legislation, Representative Cox, who was referred to as to author of the 1995 Reform Act, stated that it was his "clear understanding that Congress did not, in adopting the Reform Act, intend to alter standards of liability under the Exchange Act." 144 Cong.Rec. H6052–03, *H6061. Many other members of Congress have endorsed this view. *See generally* 144 Cong.Rec. H6052–03.

13. Under pre-PSLRA Ninth Circuit authority, scienter with conclusory allegations so long as the complaint set forth the circumstances indicating the fraudulent nature of the statements. *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548–49 (9th Cir.1994); *Fecht,* 70 F.3d at 1082 n. 4. The PSLRA's requirement that the plaintiffs plead *with particularity* facts giving rise to a *strong inference* of fraud leaves little doubt that the lenient *GlenFed*

In *Silicon Graphics,* Judge Smith formulated what could be called the "Second Circuit plus" test for determining whether plaintiffs have adequately pled scienter. That test provides:

> [I]n order to state a private securities fraud claim, plaintiffs must create a strong inference of knowing or intentional misconduct. Knowing or intentional misconduct includes deliberate recklessness, as described in *Hollinger [v. Titan Capital Corp.,* 914 F.2d 1564 (9th Cir.1990) ] and alluded to in [*Ernst & Ernst v.] Hochfelder* [425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ]. Motive, opportunity, and non-deliberate recklessness may provide some evidence of intentional wrongdoing, but are not alone sufficient to support scienter unless the totality of the circumstances creates a strong inference of fraud.

*Silicon Graphics,* 970 F.Supp. at 757. This test not only recognizes Congress' intent to heighten existing pleading standards, but also maintains recklessness, as that state of mind has been described by the Supreme Court and Ninth Circuit, as a basis for section 10(b) liability. It also recognizes that often plaintiffs can prove fraudulent intent only by circumstantial evidence, and thus courts may consider evidence of motive and opportunity in determining whether scienter has been pled. While evidence of motive and opportunity, without more, is usually insufficient under this standard, it may be sufficient if the totality of the circumstances creates a strong inference of fraud. Because this test comports with Congress' intent to strengthen existing pleading standards but does not redefine the state of mind required for section 10(b) liability, the Court finds it is an appropriate standard to apply in determining whether scienter has been adequately pled.

### 1. Plaintiffs' Allegations of Scienter

Plaintiffs allege that Boeing had both the motive and opportunity to delay disclosure of the true state of Boeing's production problems. In addition, plaintiffs allege that, given what Boeing executives actually knew about the Company's production problems, one can only conclude that Boeing's public statements were made with the intent to deceive. The plaintiffs point to large stock sales by individual defendants, the pending McDonnell Douglas merger, and Boeing's desire to increase market share as circumstantial evidence of fraudulent intent.

### (1) Stock Sales

The standard for evaluating this type of motive allegation was discussed in *Marksman Partners:*

> Allegations that a corporate insider either presented materially false information, or delayed disclosing materially adverse information, in order to sell personally-held stock at a huge profit can supply the requisite "motive" for a scienter allegation. Thus, trading activity during the class period may support a strong inference of scienter. A plaintiff, however, must demonstrate that the insider trading activity was "unusual," which requires a showing that the trading was "in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed inside information."

*Marksman Partners,* 927 F.Supp. at 1312 (citations omitted).

The plaintiffs allege that Condit and Givan sold 23.8 and 22.3% of their stock holdings, respectively, during the Class Period. Defendants challenge the plaintiffs' calculation of the percentage of stock sold by the individual defendants, arguing that plaintiffs failed to include vested stock options in calculating the total amount of stock held by the defendants. If vested stock options are included in the defendants' total holdings, the percentage of stock sold during the Class Period drops to 5.4% for Condit and 5.1% for Givan. Such small stock sales are usually held insufficient to establish motive. *See In re*

standard is no longer viable. *See Marksman Partners,* 927 F.Supp. at 1309.

*Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117–18 (9th Cir.1989) (sales of 8% held insufficient), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990); *WOW,* 35 F.3d at 1427–28 (5% insufficient).

Assuming for purposes of this motion that plaintiffs' calculations are correct, the Court nevertheless concludes that the stock sales alone are insufficient to demonstrate scienter. Plaintiffs' bare allegation that the timing of the stock sales is "suspicious" is insufficient to raise a strong inference of fraud. Plaintiffs make no factual allegations that would support a finding that the timing or amount of these stock trades was in fact suspicious. In fact, publicly available SEC disclosure forms show that these stock trades were consistent with the individual defendants' previous trading history. *See* Exs. 18–21. For these reasons the Court concludes that plaintiffs' allegations regarding the defendants' stock sales are insufficient to raise a strong inference of fraudulent intent.

#### (2) *Increasing Market Share*

█ The same is true of plaintiffs' argument concerning Boeing's desire to increase market share. Those allegations lack the specificity necessary to raise a strong inference of fraudulent intent. A desire to increase market share, like the desire to remain profitable, is a generic motive that fails to satisfy the heightened pleading standards for scienter under the PSLRA.

#### (3) *McDonnell Douglas (MD) Merger*

Plaintiffs argue that the defendants concealed Boeing's production problems so that the price of Boeing stock would remain high enough to make the merger attractive to McDonnell Douglas shareholders. The defendants argue that the plaintiffs' allegations of motive are nonsensical because the price of Boeing stock after the October 22 disclosure of negative information was still higher than the price of Boeing stock the day before the merger was announced.

█ For purposes of this motion, the Court must assume that plaintiffs' allegations are true and consider whether plaintiffs' motive theory has sufficient substance that it withstands a motion to dismiss when considered in the context of the totality of circumstances. Allegations of motive that are generally held by similarly positioned executives and companies, i.e., to improve the company's financial health or reputation, are insufficient to demonstrate scienter. *See Marksman Partners,* 927 F.Supp. at 1310 and authorities cited therein. Thus, motive to defraud is not demonstrated by a general allegation that the company hoped to remain an attractive merger partner. In this case, however, plaintiffs make specific allegations about Boeing's need to control the price of its stock for purposes of consummating the merger.

█ According to the Consolidated Complaint, the merger between Boeing and McDonnell Douglas was announced in December 1996. McDonnell Douglas had insisted on, and received, a 21% premium for its shareholders, resulting in a 1.3 (split-adjusted) shares of Boeing stock for each share of McDonnell Douglas stock. The deal required approval by two-thirds of McDonnell Douglas shareholders and was expected to close by mid 1997. The shareholders approved the merger, and the merger became final, in August 1997. *See* Complaint at ¶ 10. Plaintiffs allege that Boeing desperately wanted the long-negotiated merger to be approved because it needed MD's additional engineering and production facilities to meet the high demand for its aircraft. According to plaintiffs, defendants deliberately understated the extent of its production problems and expected losses in order to keep its stock attractive to MD shareholders. The fact that the "bait" for the MD shareholders was Boeing's stock made the price of Boeing stock a critical factor. Unlike in other cases, where plaintiffs have made generic allegations of motive, plaintiffs here have made specific allegations concerning Boe-

ing's need to use its stock to acquire a particular company at a particular price.

While Boeing strongly disputes this version of events, the Court is not permitted at this time to rule on the merits of plaintiffs' claims. The sole issue before the Court is whether plaintiffs' allegations are sufficient to withstand a motion to dismiss. Here, plaintiffs have alleged that defendants had a motive for concealing the true extent of its production problems. While that alone is insufficient to give rise to a strong inference of fraudulent intent, plaintiffs have coupled their motive allegations with allegations that during the pre-merger period the Company made disclosures concerning production problems that were inconsistent with the Company's own information about the extent and nature of its production difficulties and the Company's ability to resolve them. Plaintiffs' allegations concerning Boeing's need to consummate the merger, together with the allegations in plaintiffs' complaint concerning the defendants' failure to reveal the extent of Boeing's production problems during this period, raise a strong inference of fraudulent intent concerning alleged misrepresentations before the merger was approved.

Plaintiffs' allegations of scienter are murkier, however, with respect to alleged misrepresentations made after the merger was approved by MD shareholders. The gist of plaintiffs' Complaint is that Boeing had to keep its stock price high enough to make the merger attractive to MD shareholders. Once those shareholders had approved the merger in August 1997, however, and the merger "became final," *see* Complaint at ¶ 10, defendants' motive argument evaporates. The question then is whether in the absence of this motive allegation, plaintiffs have pled sufficient facts to raise a strong interference of knowing or intentional misconduct with respect to statements made after the merger was approved.

Although plaintiffs have not provided a motive for defendants' alleged misrepresentations after the merger was approved, the totality of the circumstances, as alleged and described in the plaintiffs' complaint, gives rise to a strong inference of fraudulent intent. Plaintiffs allege that the defendants had knowledge of reports and information, and held meetings, concerning the "disastrous" results of its aircraft production operations. *See* Consolidated Complaint at ¶ 168. They further allege that the individual defendants, who were responsible for the reliability of the Company's system of internal controls, knew that its reassuring public statements concerning Boeing's production problems were at odds with internal reports showing that the problems were "disastrous" and "out of control." Taking the allegations in the complaint as true, the Court concludes that plaintiffs have alleged conscious behavior that allows an inference of fraudulent intent against the defendants.

### D. *Accounting Fraud*

 Plaintiffs allege that Boeing's second quarter financial statements were fraudulent because "known contingent losses on aircraft programs" were "omitted" in violation of GAAP. Specifically, plaintiffs allege that Boeing failed to (1) disclose its abnormal production costs, i.e., the aggregate amount by which costs for each of its programs exceeded the estimated average costs per unit as of that date; (2) disclose risks and uncertainties that made it at least reasonably possible that any change in estimates would occur near term; (3) disclose known losses and costs resulting from its production problems; and (4) recognize a material portion of the $700 million loss on the 737NG that it ultimately recognized in the third quarter.[14]

---

**14.** On October 24, 1997, Boeing announced that third quarter earnings would be reduced by $1.6 billion as a result of "unplanned and abnormal production inefficiencies and late-delivery costs." Ex. 8. The $1.6 billion charge consisted of two components: (1) $700 million of losses on the 737NG program, and (2) $900 million of costs on other programs.

Plaintiffs' primary argument is that SOP 81–1 and FAS 5 require that a provision for the entire loss on an aircraft program be taken in the period in which the losses become evident. SOP 81–1 at ¶ 85 states, "When the current estimates of total contract revenue and contract costs indicate a loss, a provision for the entire loss should be made." FAS 5 provides that an estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: "(1) information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired ... at the date of the financial statements; and (2) the amount of the loss can be reasonably estimated." ASR 164 provides that when a company is aware that the estimated production costs of completing all units expected to be completed under the program exceeds the estimated production costs of those units, the difference must be stated in the financial statements or footnotes thereto.

In the *third* quarter of 1997, Boeing recorded a "forward loss" [15] on the 737NG's initial program block of 400 airplanes. The plaintiffs claim that this "forward loss" should have been recorded in the *second* quarter because Boeing knew by the end of the second quarter that it would suffer a loss.

The plaintiffs' allegations of accounting fraud are too thin to meet the heightened pleading standards of the PSLRA. Plaintiffs allege that as early as May 12, 1997, Boeing officials were aware of cost overruns at the Wichita facility alone that would amount to $183 million and that behind schedule jobs which caused that deficit also existed at the Renton and Everett facilities. Plaintiffs also allege that Boeing knew by April 1997 that it would incur significant expenses related to the massive production increases the Company was planning. But these allegations do not demonstrate that Boeing knew in the second quarter that the total cost to complete the block of 737NGs would exceed the total revenue. In fact, plaintiffs' Consolidated Complaint shows that the increase in behind schedule jobs was substantially greater in the third quarter than in the second quarter. Plaintiffs' complaint fails to allege facts demonstrating that Boeing knew in the second quarter that the total cost to complete the block of 737NGs would exceed the estimated revenue to be generated by that block. Plaintiffs' allegations do not demonstrate that Boeing's decision not to record the "forward loss" in the second quarter under its accounting method was intentionally fraudulent or consciously reckless.

The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. *WOW*, 35 F.3d at 1426–27. Scienter "requires more than a misapplication of accounting principles." *Id.* Plaintiffs' allegations, even if accepted as true, raise no more than a challenge to Boeing's judgment. *Cf. Harris v. IVAX Corp.*, 998 F.Supp. 1449, 1454–55 (S.D.Fla.1998). There are no specific allegations that

---

**15.** Boeing uses program accounting. Under program accounting, Boeing commits to an initial block of airplanes based on expectations for 3 to 5 years, not actual orders, and to determine the cost of an airplane, averages (or amortizes) the estimated tooling, special equipment, and general production costs for all the planes in the block. All of the startup and initial production costs are recorded as "inventoried costs" on Boeing's balance sheet. When Boeing begins to deliver airplanes and recognize revenue, it begins to recognize the costs of production. Thus, the cost of an airplane delivered in the first few quarters does not bear all of the heavy initial startup and tolling costs for a program that could last many years. For each program, Boeing reviews and reassesses both the estimated average costs and the estimated total revenue on a quarterly basis. If Boeing believes the cost to complete a program's block has changed, Boeing increases or decreases the average cost of current and future deliveries of the remaining airplanes in the block. *Only when Boeing estimates that the total cost to complete the block exceeds the estimated revenue to be generated by the block, can Boeing record that difference as a "loss" in the current quarter, which is called a "forward loss."*

would demonstrate that Boeing clearly had an obligation at that specific time to record the forward loss, and it chose not to do so with the intent to defraud. In fact, the allegations in plaintiffs' complaint show that production problems, while present in early 1997, substantially worsened as the year continued.[16] This suggests that it was not until later in the year that Boeing knew a loss on the entire program would be likely.

The plaintiffs' other claims of accounting fraud relate to a failure to recognize certain abnormal costs, risks, and penalties in Boeing's second quarter 10–Q. Boeing argues that plaintiffs misunderstand program accounting. Moreover, the Company contends that it recognized these costs, risks, and penalties in the 1996 Form 10–K or third quarter 10–Q, as appropriate. The Court cannot resolve on a motion to dismiss the factual issues raised by the defendants. Rather, the Court's role is to consider whether plaintiffs have pled with specificity its allegations of accounting fraud.

Plaintiffs have failed to plead with sufficient specificity their claims that Boeing should have recognized certain costs and penalties and disclosed certain risks in its second quarter Form 10–Q. The plaintiffs argue that Boeing knew as a result of its production problems that it would incur significant costs and would be subjected to penalties for late deliveries. Other than the $183 million cost overrun at the Wichita facility, plaintiffs have failed to identify the specific costs that had to be recognized, and have failed to plead facts showing that the failure to include these costs was part of Boeing's overall scheme to defraud investors. In support of their argument that Boeing knew it would face late delivery penalties in the second quarter, the plaintiffs provide a list of aircraft in production in 1996 and 1997, which compares each airplane's shop complete date with its contract delivery date. Complaint

at ¶¶ 66, 67. Although the list shows that many airplanes produced in 1996 were not completed until after the contract delivery date, the list for 1997 deliveries shows that the shop complete date preceded the contract delivery date in almost every case. The plaintiffs' allegations do not provide the necessary link between the raw information about late deliveries in 1996 and early 1997 and the allegation that there were late-delivery penalties that were incurred in and had to be recognized in the second quarter of 1997, rather than at some other time. In short, plaintiffs' allegations of accounting fraud are too generalized and conclusive to satisfy the heightened pleading standards of the PSLRA.

## V. *State Law Claims*

■ Defendants argue that allowing plaintiffs' state law claims to proceed would frustrate the purposes of the safe harbor provisions of the PSLRA. The Court rejects this argument.

In the absence of explicit statutory language, state law is preempted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. *English v. General Electric Co.*, 496 U.S. 72, 78, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Such an intent may be inferred from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Finally, state law is preempted to the extent that it *actually conflicts* with federal law. Thus, the Supreme Court has found preemption where it is impossible for a private party to comply with both state and federal requirements. *Id.*

Defendants point out that in *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629,

---

**16.** Boeing's database showed that as of June 6, 1997, the 737 program was 4,300 jobs behind. By October 1, 1997, the 737 program was 8,400 jobs behind schedule. *See* Complaint at ¶ 107(1).

73 L.Ed.2d 269 (1982), the Supreme Court found that a federal securities law (the Williams Act) preempted an Illinois tender offer rule because it frustrated the purpose of the Act. In that case, however, Congress adopted specific rules dealing with how tender offers should proceed and the specific notice required. The Illinois law would have required the tender offeror to provide notice in a manner inconsistent with the federal law. Thus, compliance with the state law nullified completely the provisions of the federal law.

The conflict present in *Edgar* simply does not exist here. There are many circumstances where Congress offers more protection to a class of persons under federal law than is offered under state law. That does not mean that the two laws are in conflict. Until Congress specifically preempts this field, there is no basis for finding that plaintiffs' claims under the Washington State Securities Act have been preempted by the PSLRA.

### CONCLUSION

The Court GRANTS the defendants' motion to dismiss plaintiffs' claims of accounting fraud. The Court DENIES the motion in all other respects. Plaintiffs' claims of accounting fraud are dismissed without prejudice.