*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0359P (6th Cir.)
File Name: 03a0359p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

JOEL MILLER; GARY KISSIAH;
SIMCHE MARGULIES,
individually and on behalf of
all others similarly situated,
    *Plaintiffs-Appellants,*

    *v.*

CHAMPION ENTERPRISES,
INC., a Michigan corporation;
WALTER YOUNG,
    *Defendants-Appellees.*

No. 01-1955

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-74231—John Feikens, District Judge.

Argued: June 20, 2003

Decided and Filed: October 8, 2003

Before: DAUGHTREY and ROGERS, Circuit Judges;
QUIST, District Judge.[*]

———————

[*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

———————

## COUNSEL

**ARGUED:** Robin Howald, GLANCY & BINKOW, Los Angeles, California, for Appellants. Donna L. McDevitt, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Chicago, Illinois, for Appellees. **ON BRIEF:** Robin Howald, Lionel Z. Glancy, GLANCY & BINKOW, Los Angeles, California, E. Powell Miller, MANTESE MILLER & SHEA, Troy, Michigan, for Appellants. Donna L. McDevitt, Timothy A. Nelsen, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Chicago, Illinois, Andrew J. McGuinness, DYKEMA GOSSETT, Ann Arbor, Michigan, Carl H. Von Ende, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, for Appellees.

———————

## OPINION

———————

ROGERS, Circuit Judge. Plaintiff Joel Miller, a shareholder of Champion Enterprises, Inc. ("Champion"), appeals from the dismissal of his complaint, referred to as the "CAC,"[1] pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. 78u-4 *et seq.* Plaintiff sued Champion and its Chief Executive Officer for securities fraud under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission (the "SEC"), alleging that the defendants made

———————

[1] The dismissed complaint was styled "Consolidated and Amended Class Action Complaint," and has generally been referred to as the "CAC."

various false or misleading statements related to the bankruptcy of its largest customer. The district court dismissed the CAC because (1) it failed to meet the heightened pleading requirements for scienter of the PSLRA, (2) a number of the alleged misleading statements qualified as "forward-looking statements" protected by the PSLRA's safe harbor provision, and (3) the CAC failed to give rise to a strong inference that Champion or its CEO knowingly or recklessly misstated or omitted any material facts.

Plaintiff also appeals from the district court's denial of leave to file a proposed amended complaint, referred to as the "SASC."[2] The district court denied plaintiff's leave to file the SASC on two grounds: (1) the PSLRA restricts Rule 15 of the Federal Rules of Civil Procedure, thereby barring repeated amendments to a complaint governed by the PSLRA, and (2) the proposed amendments were futile. For the following reasons, we AFFIRM the judgment of the district court.

## I. BACKGROUND

Plaintiff brought this securities fraud action against Champion and Walter Young, President, Chairman of the Board of Directors, and Chief Executive Officer of Champion, for making allegedly false or fraudulent statements concerning Champion's relationship with Ted Parker Home Sales, Inc. ("Parker Homes"), and especially with regard to Parker Homes's filing for bankruptcy on July 22, 1999. Champion, headquartered in Michigan, is the largest producer of manufactured housing in the nation, and one of the largest retailers, although it sells the manufactured homes through both its own 280 retail stores and 3,500 independent retailers. Parker Homes, headquartered in North Carolina, was Champion's largest independent retailer, accounting for 3.5 percent of the 70,000 homes sold by Champion in 1998.

Prior to 1998, Champion, through two of its subsidiaries, entered into agreements with Parker Homes whereby Parker Homes would receive substantial volume discounts for inventory purchases (the "Bonus Program"). Parker Homes would also receive an additional $1,000 or $2,000 for each single-section or multi-section home purchased under the Bonus Program. Parker Homes did not purchase the homes in its inventory directly. Instead, the homes were purchased through third-party finance companies, which charged Parker Homes interest on the amount financed. When Parker Homes sold a home, it paid the finance company from the proceeds of the sale. However, if a home remained unsold for 12 to 15 months and if the retailer—Parker Homes—went bankrupt or defaulted, Champion was obligated by the finance company to repurchase the home. Champion recognized revenue once financing was obtained, and Parker Homes received the advances under the Bonus Program at the same time. Parker Homes was required to repay these advances if Champion repurchased the home. However, according to the plaintiff, this contingency was unlikely because Champion would only repurchase the home if Parker Homes went bankrupt or otherwise defaulted, in which case Parker Homes would be unable to repay the advances.

Ted Parker was the original owner of Parker Homes. In December of 1998 he sold a controlling interest of 60 percent in Parker Homes to two professional investors, GE Investment Private Placement Partners II, L.P. ("GE Partners"), and Ardhouse, L.L.C. ("Ardhouse"). In the course of the transaction two holding companies (the "Holding Companies") were created through which Ardhouse and GE Partners invested approximately $42 million in Parker Homes. Champion asserts in its brief that Ted Parker's

---

[2] The proposed amended complaint was styled "Second Amended and Supplemental Consolidated Class Action Complaint," and has generally been referred to as the "SASC."

purpose in undertaking this transaction was to provide funding to Parker Homes for the opening of 26 new retail centers.

Prior to this transaction between Parker Homes, GE Partners, and Ardhouse, Champion and Parker Homes had entered into agreements (the "revolving loan agreement") whereby Champion would lend Parker Homes $250,000 for each new sales center that Parker Homes opened, and Champion would credit $50,000 toward repayment of these loans for each year a sales center purchased $5 million in inventory. These loans by Champion were unsecured and could not exceed $8 million. These agreements were renewed on May 5, 1999, and also on that date, Champion agreed to advance to Parker Homes an additional $2.25 million pursuant to these agreements.

According to the plaintiff, beginning in the first quarter of 1999, Parker Homes's inventory became significantly overstocked. He cites as evidence of the overstocked inventory a statement in GE Partners and Ardhouse's complaint in their lawsuit against Ted Parker and others for fraud with respect to the sale of the 60% controlling interest. The statement alleges that Parker Homes's "inventory build-up was so large that the Company was unable to fit all the homes it purchased on its sales sites and, as a result, had to convert extra lots into storage centers." The plaintiff also points to a due diligence report that was undertaken by PricewaterhouseCoopers, L.L.P., on behalf of GE Partners and Ardhouse prior to their purchase of the controlling interest in Parker Homes. This report showed that (1) Parker Homes's inventory that was older than 15 months had increased from 4.9% to 10% from December 31, 1997, to September 18, 1998; (2) the average value of the inventory at each of Parker Homes's sales centers had increased over the 18 months that ended June 30, 1998; and (3) inventory

turnover had decreased from an adjusted turnover rate of 1.7 on December 31, 1996, to 1.4 on June 30, 1998.[3]

According to the plaintiff, Champion was aware or should have been aware of the overstock of inventory by Parker Homes in the first quarter of 1999. He refers to several instances when the defendants stated that they had been monitoring inventory levels, both as a general matter and specifically as to Parker Homes. The plaintiff also notes several statements by industry experts that speak of the excess inventory in the manufactured home market.

Plaintiff also argues that several other facts, not included in the CAC, but outlined in detail in the SASC, show that Champion knew that Parker Homes was both overstocked and in some financial danger during the first quarter of 1999. A former Parker Homes sales manager in North Carolina, John Trapaso, said that one of Champion's local manufacturing plants "stayed in business because Ted [Parker] kept the excess inventory going." Plaintiff also states that a former Champion employee, unnamed, estimated that Champion sold $3 million to $4 million worth of unfinanced homes without purchase orders to Parker Homes sometime around May 1999. This same employee went on to say that "[a]t the end, Parker did not order a ton of houses. We forced them down his throat to keep the plants running." According to this employee, "everyone at the plant" was talking about this situation, including upper management.

Plaintiff further asserts that Parker Homes's sales and storage facilities became so overstocked that Champion had to store more than 200 homes at one of its wholly-owned subsidiary's facilities. These homes were apparently visible

---

[3] GE Partners and Ardhouse still decided to go forward with the financing agreement despite having prior knowledge of these figures from the due diligence report.

to the executives of the subsidiary when they were flying into the nearby airport. Plaintiff contends that these facts were confirmed by allegations made in a complaint filed by the Holding Companies against Ted Parker. Plaintiff alleges that John Trapaso, who originally worked for Parker Homes and later worked for Champion, indicated that Parker Homes "always" had too much inventory and that Champion knew this because sales representatives from its wholly-owned subsidiary were "always going from one [Parker Homes] lot to another." Trapaso also stated that the manager from the subsidiary told him in March 1999 that Parker Homes had too much inventory and "was going to go bankrupt." The same manager told Trapaso, in late March 1999, that Champion could no longer deliver houses to Parker Homes because Parker Homes had exhausted its financing. Finally, according to a former employee of Parker Homes, Wayne Murchison, when rumors began to circulate within Parker Homes in March 1999 that the company was in financial straits, two Parker Homes managers, Kathy Parker and Bob Dowless, told the employees that "everything would be okay because Champion would take over the company soon."

On June 28, 1999, the Holding Companies that owned Parker Homes pursuant to GE Partners and Ardhouse's purchase of a controlling interest in Parker Homes filed a Chapter 11 bankruptcy petition. The board of directors of Parker Homes also approved the filing of a Chapter 11 petition for Parker Homes on June 28. By June 30, 1999, Champion was aware that the Holding Companies had filed for bankruptcy. Thereafter, Champion, Ted Parker, GE Partners, and Ardhouse began discussing plans to fund the continuing operations of Parker Homes and avoid a bankruptcy filing. Champion, GE Partners, and Ardhouse executed a letter of intent on July 15, 1999, whereby they agreed to the creation of a senior secured credit facility to meet Parker Homes's funding needs. Pursuant to this letter of intent, on July 16, 1999, Champion made an initial advance to Parker Homes of $350,000 on an unsecured basis.

Prior to the execution of the letter of intent, on July 12, Ted Parker had sent Parker Homes notices of default on lease agreements for Parker Homes's sales lots. Under these agreements, if Parker Homes did not pay Ted Parker the overdue rent on these leases by July 22, it would forfeit the sales lots. According to the plaintiff, the only means Parker Homes had to preserve the leases was to file for bankruptcy, unless Ted Parker agreed to give Parker Homes more time. The sales lots leases were Parker Homes's only unencumbered asset. According to the plaintiff, as of 1:42 a.m. on July 22, an agreement between Champion and Ted Parker with respect to these leases was not yet finalized. An e-mail of 1:42 a.m. showed that the documents for an agreement were close to final, and that Parker Homes's Board would meet in the morning "to approve the Champion and Ted deals and ratify the recent working capital borrowings from [GE Partners] and [Ardhouse]." Later that day GE Partners and Ardhouse filed for Chapter 11 bankruptcy for Parker Homes. Champion and Ted Parker were unaware that GE Partners and Ardhouse were going to take this action, and did not learn of the Parker Homes bankruptcy filing until July 23, 1999.

As of the time of Parker Homes's Chapter 11 bankruptcy filing, Parker Homes owed Champion about $10.4 million in discounts and cash reimbursements under the Bonus Program. Parker Homes also owed Champion an additional $7.2 million for loans extended when Parker Homes opened new sales centers under the Revolving Loan Agreement. Additionally, when Parker Homes filed for bankruptcy, Champion became obligated to repurchase around $69 million of Parker Homes's inventory under Champion's repurchase agreements with the third-party finance companies.

The CAC also alleged that Champion had failed to disclose its intent to purchase the assets of Parker Homes. According to the plaintiff, Champion had begun negotiating with Parker

Homes to purchase all of Parker Homes's assets sometime prior to the filing of the Holding Companies' Chapter 11 petitions. In a conference call on August 1, a Champion vice president implied to employees at Parker Homes's sales centers that Champion would be taking over Parker Homes. In a bankruptcy filing on August 9, Parker Homes and the Holding Companies stated that "[c]ommencing prior to the inception of Debtors' [Parker Homes and the Holding Companies] cases, and continuing after their filings, the Debtors negotiated with Champion Enterprises, Inc. for the sale of substantially all of their assets and post-petition financing for working capital and the Debtors' general corporate requirements pending the closing on the sale." On August 13, Champion agreed, subject to bankruptcy court approval, to: (1) repurchase all of the Parker Homes inventory that was subject to a repurchase obligation, with a value of $69 million; (2) repurchase other inventory not subject to a repurchase obligation, with a value of $10 million; (3) provide Parker Homes with $1.15 million in post-petition financing; and (4) purchase the leases for 37 Parker Homes sales centers for $1.25 million.

From July 8 until August 26, 1999, Champion made numerous public disclosures in the form of press releases, conference calls, and filings with the SEC. On July 8, Young wrote a letter to the shareholders indicating that Champion was comfortable with the earnings estimates for the second quarter of 1999. On July 21, Champion issued a press release indicating that the second quarter of 1999 had set records for revenues and earnings. Also on July 21, Champion held a conference call in which Young discussed retail inventory, turn rates, repurchase obligations, and dealer bankruptcies. On July 30, Champion again made a press release and held a conference call, in which Young discussed the circumstances and effects of Parker Homes's Chapter 11 filing, as well as Champion's relationship with Parker Homes. On August 9, Champion filed a Form 10-Q for the second quarter of 1999. In this Form 10-Q Champion disclosed in a footnote that

Parker Homes had filed a Chapter 11 petition, and that Champion would take a pre-tax charge of $33.6 million related to its repurchase obligations for Parker Homes's inventory. Finally, on August 26, Champion announced that the bankruptcy court had approved its purchase of 37 of Parker Homes's sales center leases and all of Parker Homes's inventory, totaling about 1,850 homes. Also on August 26, Champion stated that it expected that its earnings for the second half of 1999 would be 40% lower than earnings for the second half of 1998 because of a greater than expected build-up of retail inventory in the market.

On July 21, the day before Parker Homes filed for Chapter 11 relief, Champion's stock price closed at around $18 per share. Champion's stock price dropped to $13.50 per share on July 30, the day Champion announced the $33.6 million pre-tax charge. On August 26, 1999, after announcing that it expected earnings to be lower in the second half of 1999, Champion's stock price fell to $8.94 per share, having closed at approximately $11.94 per share the day before.

Plaintiff Joel Miller filed a securities fraud action against Champion and Young on August 26, 1999. Two other securities fraud class actions were also filed against Champion and Young, and these actions were consolidated on March 30, 2000. On May 15, 2000, plaintiff filed the CAC, charging Champion and Young with violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 which was promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendant Young was also alleged to have "controlling person" liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The gravamen of the CAC was that Champion "violated the federal securities laws by inadequately disclosing and accruing more than $38 million in losses stemming from Champion's undisclosed business dealings with its then-largest customer, Ted Parker Home Sales, Inc. [], a retailer of

manufactured homes that filed a Chapter 11 bankruptcy petition on July 22, 1999."

On June 30, 2000, defendants filed a motion to dismiss the CAC. Plaintiff then filed a motion for leave to file the SASC on December 1, 2000, and renewed this motion on March 27, 2001. The district court issued a Memorandum and Order on April 9, 2001, stating that the CAC must be dismissed, but stayed consideration of whether the dismissal should be with prejudice until after considering plaintiff's motion to amend. Then, on June 13, 2001, the district court issued an opinion denying plaintiff's motion to file the SASC and dismissing the case with prejudice.

## II. ANALYSIS

### A. Standard of Review

This appeal requires us to interpret the PSLRA, and questions of statutory interpretation are reviewed *de novo*. *Hoffman v. Comshare, Inc. (In re Comshare Inc. Sec. Litig.)*, 183 F.3d 542, 547 (6th Cir. 1999). We also review a district court's dismissal of a complaint under Rule 12(b)(6) *de novo*. *Id*. The facts set forth in the complaint must be accepted as true, so long as they are well pleaded. *Id*. However, the panel "is not restricted to ruling on the district court's reasoning, and may affirm a district court's grant of a motion to dismiss on a basis not mentioned in the district court's opinion." *Id*. at 548. Finally, a district court's denial of leave to amend on the ground of futility is reviewed *de novo*, *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 518 (6th Cir. 2001), although generally we review a district court's denial of leave to amend for abuse of discretion, except in cases where the district court bases its decision on the legal conclusion that an amended complaint could not withstand a motion to dismiss. *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002).

### B. General Legal Background

In his complaint, the plaintiff alleges violations by Champion and its CEO of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC. Section 10(b) of the Exchange Act and Rule 10b-5 prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *Morse*, 290 F.3d at 798; *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Section 20(a) of the Exchange Act makes a person liable for violations of the Exchange Act when that person controls the person whose action caused the violation. *See* 15 U.S.C. § 78t(a). Defendant Young's liability is therefore dependent on whether Champion's statements at issue in this case violated the Exchange Act.

In order to state a claim pursuant to Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Comshare*, 183 F.3d at 548. In the present case there is no dispute as to the purchase of securities, justifiable reliance, causation, or damages. Therefore, this case centers on two issues: (1) whether the defendants misstated or omitted material facts; and (2) whether these misstatements or omissions were made with scienter.

In order to allege scienter in a private securities action for money damages, the PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state *with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). There are three distinct scienter requirements for securities fraud actions, each of which depends on the type of statement that is being made, and, in the case of "forward-looking

statements,"[4] whether that statement was material and accompanied by meaningful cautionary statements. *See* 15 U.S.C. 78u-5(c). First, for "forward-looking statements" that are accompanied by meaningful cautionary language, the first prong of the safe harbor provided for in the PSLRA makes the state of mind irrelevant. *See* 15 U.S.C. § 78u-5(c)(1)(A); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). In other words, if the statement qualifies as "forward-looking" and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind. Second, under the second prong of the safe harbor provision of the PSLRA, in the case of "forward-looking statements" that are not accompanied by meaningful cautionary language, actual knowledge of their false or misleading nature is required. *See* 15 U.S.C. § 78u-

---

[4]Under the PSLRA, a "forward-looking statement" is defined as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

5(c)(1)(B); *see also Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (*en banc*). Finally, for statements of present or historical fact, the state of mind required is recklessness. *Vencor,* 251 F.3d at 552. Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979).

We have previously held that certain factors are usually relevant to scienter in securities fraud actions:

(1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Vencor*, 251 F.3d at 552. In this appeal, factors one, two, and six are at issue.

As stated previously, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.

§ 78u-4(b)(2). In *Vencor*, we provided a definitive explanation of the meaning of a "strong inference":

> Inferences must be reasonable and strong—but not irrefutable. "Strong inferences" nonetheless involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact. Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder. Rather, the "strong inference" requirement means that plaintiffs are entitled only to the most plausible of competing inferences.

251 F.3d at 553. Thus, if certain factors are not met in the complaint—factual particularity and the most plausible of competing inferences—"the court shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A).

## C. Scienter was Pleaded with Sufficiently Particular Facts

One factor on which the district court based its dismissal of the CAC was a failure by the plaintiff to plead scienter with sufficient particularity. Specifically, the district court went through the complaint paragraph by paragraph, analyzing each of the factual allegations and attempting to connect these allegations with the allegations of scienter to determine if they were sufficiently well pleaded so as to satisfy the requirements of the heightened pleading requirements of the PSLRA. Ultimately, the district court concluded that the plaintiff "'failed to craft a Complaint in such a way that a reader can, without undue effort, divine why each alleged statement was false or misleading.'" R.40, Opinion (April 9, 2001) (granting motion to dismiss consolidated amended class action complaint) (quoting *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998)).

The plaintiff takes issue with the district court's finding that he was unable to draft an adequate complaint. He argues that the district court erred in the method it used to analyze the CAC, characterizing the district court's standard of review as requiring that each paragraph contain all the elements necessary to state a securities fraud claim. This standard, plaintiff argues, is unsupported by either the PSLRA or the Federal Rules of Civil Procedure, and therefore the district court's judgment should be reversed.

Plaintiff is correct in his contention that nothing in the PSLRA or the Federal Rules of Civil Procedure supports a method of analysis that would require all the elements of a securities fraud claim to be stated in each paragraph of a complaint. However, nowhere in its 39-page opinion did the district court purport to be applying such a standard. We assume, therefore, that the plaintiff must be asserting that such a method, as a practical matter, was the one used by the district court, not that the district court explicitly held that such a method was the one to be applied.

There is some merit to this characterization of the district court's opinion. The district court approached the CAC in a highly systematic—and somewhat rigid—manner and overlooked some of plaintiff's attempts to connect its factual allegations and allegations of scienter. Plaintiff alleged some kind of scienter in paragraphs 4, 39-40, 47-48, 64, 66-67,[5] 69, 70, 73-75, and 82.[6] Many of these allegations were general and therefore insufficient to meet the particularity

---

[5] Plaintiff makes no argument that the allegations of scienter, or even the underlying facts, alleged in paragraphs 64, 66, and 67, are sufficient to support a securities fraud claim, and we will not address them here.

[6] The content of these paragraphs will be set forth in the subsequent footnotes.

requirements of the PSLRA.  *See* ¶¶ 69, 70, 73-75, 82.[7] Moreover, other allegations of scienter were not asserted in relation to a statement or omission of a material fact, but rather with respect to Champion's substantive actions throughout the underlying situation, and thus do not allege scienter sufficient as a basis for a securities fraud action. *See* ¶ 48.[8]  However, some of the allegations of scienter are, albeit loosely, tied to the alleged false or misleading statements or to omissions of material facts listed in the complaint.  *See* ¶¶ 4, 39-40, 47.[9]

---

[7] ¶ 69 alleges: "Defendants' false representations and material omissions were made with *scienter* [emphasis in original] in that defendants *knew or recklessly disregarded* [emphasis added] that the public documents and statements issued or disseminated by Champion were materially false or misleading."

¶ 70 alleges: "defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker *knew* that the particular forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Champion who *knew* that those statements were false when made" (emphasis added).

¶ 73 alleges: "they *knowingly and/or recklessly* made and/or failed to correct public representations which were or had become materially false and misleading regarding Champion's financial results and operations . . . the defendants caus[ed] Champion to publish public statements which they *knew, or were reckless in not knowing*, were materially false and misleading" (emphasis added).

¶ 74 alleges: "Defendant Young . . . control[led] the content of the aforesaid statements . . . and/or . . . fail[ed] to correct those statements in a timely manner once he *knew or was reckless in not knowing* that those statements were no longer true or accurate" (emphasis added).

¶ 75 alleges: "Defendant Young had *actual knowledge* of the facts making the material statements false and misleading, or *acted with reckless disregard for the truth* in that he failed to ascertain and to disclose such facts, even though same were available to him" (emphasis added).

¶ 82 alleges: "Defendant Young's position made him privy to and provided him with *actual knowledge* of the material facts concealed from lead plaintiffs and the Class" (emphasis added).

[8] ¶ 48 alleges: "As a result, Champion *knowingly or recklessly* increased its risk of being required to purchase overvalued, unsold inventory."  The other allegations of scienter in ¶ 48 are simply assertions that the defendants knew of or recklessly disregarded other "improper conduct" by Parker Homes, but the plaintiff does not allege any facts to support the inference that the defendants knew of or recklessly disregarded this conduct.  Plaintiff alleges: "Plaintiffs are informed and believe that Champion *knew of or recklessly disregarded* other improper conduct in which Parker Homes engaged in an effort to show false profits. . . . Champion *knew or recklessly disregarded* the likelihood that Parker Homes's severe cash shortage could result in violations of its trust agreements . . . . Champion *knew or recklessly disregarded* that Parker Homes was adding additional costs to the invoice price of homes for non-existent furniture . . ." (emphasis added).

[9] ¶ 4 alleges: "Plaintiff's contend that defendants materially overstated Champion's earnings, revenues, and prospects by . . . (b) *[k]nowingly or recklessly* failing to accrue [an $18 million dollar loss on money lent to Parker Homes] in light of the fact that Champion was fully aware [that the parent companies of Parker Homes filed for bankruptcy, as shown by a statement that implies that Champion knew of the parent companies' financial difficulties] . . . (d) *[k]nowingly or recklessly* failing to disclose that the anticipated loss upon resale of repurchased inventory was only one component of the $33.6 million charge against earnings taken in the third quarter of 1999 [as shown by a statement by Young that implies that 85 percent of the charge would be the result of resale losses, while Champion's 1999 Form 10-K shows that more than 50 percent of the charge was attributable to loans, advances, and discounts to Parker Homes] . . . (f) *[k]nowingly or recklessly* concealing that Parker Homes was not going to obtain debtor-in-possession financing [as shown by two statements by officers of Champion stating that they were unaware of whether Parker Homes would obtain financing, while a later statement implied that Champion was negotiating to buy Parker Homes during the time period the earlier statements were made]" (emphasis added).

¶ 39 alleges: "In light of the following facts *known* to defendants, [defendants earlier statements that they were monitoring inventory levels, did not voluntarily repurchase inventory, and that only one or two of their dealers had gone bankrupt] were materially false, misleading and incomplete, [(1) because] Champion was *aware* [that Parker Homes had extreme amounts of excess inventory] because it was unable to ship [new inventory] to Parker Homes until additional financing was in place [as

The SASC did not remedy any of the shortcomings of the CAC with respect to pleading scienter with sufficient particularity. The SASC adds more facts, but it does not link these facts with the allegations of scienter any more than the

---

shown by a statement in Ted Parker's complaint in another lawsuit, as well as other submissions in that lawsuit], [(2) because Parker Homes parent companies had already declared bankruptcy before these statements were made, a fact which Champion must have been aware of, and (3) because Champion had lent Parker Homes $2.25 million and $350,000 as working capital in order to save it from bankruptcy, and were in negotiations to purchase all of Parker Homes's assets, as shown by statements in Ted Parker's complaint in another lawsuit and other documents]" (emphasis added).

   ¶ 40 alleges: "Champion *knew* both that Holding Companies and Parker Homes had filed Chapter 11 petitions and that Champion would soon purchase substantially all of the assets of Parker Homes [as shown in the above paragraphs, but Champion still failed to accrue an $18 million loss in their second quarter financial statements as required by GAAP]" (emphasis added).

   ¶ 47 alleges: "In light of the following facts *known* to Champion, [Champion's representations (1) that its second quarter was 'another all-time record quarter,' (2) that it had a 'strong balance sheet' and 'superior returns on shareholder equity,' (3) that it had record sales performance in the first half of 1999, (4) that Parker Homes bankruptcy was 'unanticipated,' (5) that it hoped that Parker Homes could 'continue to operate through Chapter 11 and eventually come out of it,' (6) that it kept 'close tabs on the contingent liability' it has with each of its retailers and had been 'watching Parker Homes inventory turn,' (7) that it didn't know if Parker Homes would obtain debtor in possession financing, and (8) that the charge it would take because of Parker Homes's bankruptcy was primarily 'for the discounting that is anticipated in the reselling of the homes and for the removal and relocation costs associated with the repurchase of the homes'] were materially false, misleading and incomplete [as shown by (1) the notes of counsel in another lawsuit that Champion aware that Parker Homes was in severe financial difficulty and might need to file for Chapter 11, (2) submissions in the bankruptcy proceeding that Champion would repurchase all of Parker Homes's inventory, including that which they were not obligated to repurchase, and provide post-bankruptcy-petition financing to Parker Homes, and (3) agreements between Champion and Parker Homes which gave Parker Homes strong incentives to have excess inventory]" (emphasis added).

CAC does. In fact, the SASC simply reiterates the scienter allegations of the CAC.

Although we understand the district court's frustration with the complaint, as the CAC does not link the factual allegations with defendant's purported scienter in a particularly cogent manner, we nevertheless find that the complaint is not so inadequate in this respect that it merits dismissal. The plaintiff did not simply make "conclusory allegations of recklessness, intention, or misconduct." *Burns v. Prudential Sec.*, 116 F. Supp. 2d 917, 925 (N.D. Ohio 2000). However, as indicated below, we further conclude that the district court was correct in holding that the CAC did not contain allegations sufficient to state a claim under the heightened pleading requirements of the PSLRA.

## D. The CAC Did Not Contain Allegations Sufficient to State a Claim

In order for a complaint to be adequate, it must contain allegations sufficient to state a claim. Under the PSLRA and our prior caselaw, these allegations must give rise to a strong inference—the most probable of competing inferences—that the defendants made false or misleading statements with the required state of mind. *See* 15 U.S.C. § 78u-4(b)(2); *Vencor*, 251 F.3d at 553. Plaintiff alleged six separate communications that he contends were false or misleading: (1) Young's letter to Champion shareholders on July 8, 1999; (2) Champion's press release on July 21, 1999; (3) Champion's conference call on July 21, 1999; (4) Champion's press release on July 30, 1999; (5) Champion's conference call on July 30, 1999; and (6) Champion's second quarter Form 10-Q which was filed with the SEC on August 9, 1999. Some of these communications fall within the safe harbor for "forward-looking statements" provided by the PSLRA, while the others do not give rise to a strong inference that Champion or Young acted with sufficient scienter to survive a Rule 12(b)(6)

motion dismiss under the heightened pleading requirements of the PSLRA.

### 1. The July 8, 1999, Letter to Shareholders

The July 8, 1999, Letter to Shareholders was forward-looking and fell within the safe harbor provision because it was accompanied by meaningful cautionary language. The letter, written by Young to Champion's shareholders, stated in pertinent part:

As we start the second half of the year, we know that you are as concerned as we are regarding the performance of Champion Enterprises stock compared with the overall market. Housing stocks in general have under performed the markets in 1999, and we are no exception. Given the continuation of outstanding earnings growth and the successful implementation of our retail strategy, we challenge ourselves as to what we can do to enhance our stock value in a market dominated by Internet and the Dow Jones Nifty 50 stocks . . . .

Some of our competitors have reported problems with meeting earnings estimates. Champion recently announced that we were comfortable with consensus earnings estimates of $0.59 per share for the second quarter, which would be a 13 percent increase compared to last year.

J.A. at 1045-46. The district court found that these statements were forward-looking and accompanied by sufficient cautionary language, and therefore protected under the safe harbor provisions of the PSLRA.

Plaintiff alleges that the statements with regard to Champion's earnings estimates were materially misleading given that Champion and Walter Young knew of Parker Homes's poor financial condition and the probability of its

bankruptcy which would adversely impact Champion. Plaintiff further alleges that the statements are not subject to the PSLRA's safe harbor provision, because they are not forward-looking and lack meaningful cautionary language. Specifically, plaintiff argues that the word "continuation" refers to the present state of affairs, and that cautionary language referring to business downturns and possible inventory excesses is insufficient disclosure since Champion did not disclose the nature of its loans to Parker Homes. He also contends that the district court misapplied the holding in *Ivax* in finding that the statements were forward-looking.

In *Ivax*, the plaintiff sued Ivax Corporation for securities fraud and alleged that Ivax had made false or misleading statements concerning its financial outlook. 182 F.3d at 802. Ivax moved to dismiss the claims based on the safe harbor provision and heightened pleading requirements of the PSLRA. *Id*. The district court dismissed the action, and on appeal the Eleventh Circuit affirmed the judgment of the district court. *Id*. at 802, 808. In reaching this conclusion, the Eleventh Circuit held that in certain situations, mixed statements of present fact and future prediction must be treated as wholly forward-looking. *Id*. at 805-07.

We find plaintiff's arguments with regard to the July 8, 1999, Letter to Shareholders to be unpersuasive. The statements by Walter Young in his letter to Champion shareholders appear to be classically forward-looking. The statements speak of earnings "estimates," of "challenging" themselves to "enhance" their stock value. These are all statements that imply projections or objectives, falling squarely within the definition of "forward-looking statements" found in 15 U.S.C. § 78u-5(i)(1).[10] The phrase

_____

[10] In addition, we note that Champion did actually have earnings of $0.59 per share in the second quarter as announced on July 21, 1999, therefore undermining the notion that these statements were either false

"given the continuation of outstanding earnings growth and the successful implementation of our retail strategy," although certainly implying some present circumstances, also is the basis for the later "forward-looking statements," thus qualifying as an "assumption underlying" a "forward-looking statement" found in 15 U.S.C. § 78u-5(i)(1)(D).[11]  *See Ivax*, 182 F.3d at 804-805 (the phrase "[r]eorders are expected to improve as customer inventories are depleted" was found to be a "forward-looking statement" under the "assumptions underlying" definition in 15 U.S.C. § 78u-5(i)(1)(D)). Furthermore, the July 8 letter does not contain a mixed statement of present fact and future prediction similar to that discussed in *Ivax*, and therefore we do not need to address plaintiff's argument in this regard.  Given these facts, we conclude that the statements are forward-looking for the purposes of the PSLRA.

However, in order to be protected by the safe harbor provisions of the PSLRA, these statements must also have been accompanied by meaningful cautionary language. We conclude, as did the district court, that the statements were accompanied by meaningful cautionary language. The July 8 letter cited Champion's risk disclosures in its 1998 Form 10-K, which included a risk related to inventory levels of manufactured housing retailers. Additionally, the letter itself contained warnings that "housing stocks in general have

---

or misleading.  Plaintiff argues that these earnings were nevertheless misleading because Champion actually should have taken a loss during the second quarter due to Parker Homes's probable bankruptcy.  This will be discussed in greater length later in this opinion.

[11]Plaintiff's reliance on *In re Boeing Sec. Lit.*, 40 F. Supp. 2d 1160, 1169 (W.D. Wash. 1998) is unavailing.  The portion of that opinion quoted by the plaintiff relates back to statements by the defendant in that case that are almost exclusively statements of present or historical fact and certainly do not provide the basis for any future projections, unlike the statements at issue here.

underperformed the markets in 1999," and that "in certain regions we see too many retail locations, suggesting an over supply of retail inventory of homes in that region." Plaintiff argues that Champion should also have disclosed the nature of their loans to Parker Homes. This goes too far. Champion disclosed the exact risk that occurred in this situation: excess retailer inventory that could lead to negative economic effects on Champion. Champion is not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk.

Accordingly, since we conclude that the statements in Walter Young's July 8 Letter to Shareholders were both forward-looking within the meaning of the PSLRA, and that they were accompanied by meaningful cautionary language, the statements are subject to the safe harbor provisions of the PSLRA and are therefore not actionable. No investigation of defendant's state of mind is required. *See* 15 U.S.C. § 78u-5(c)(1)(A); *see also Ivax*, 182 F.3d at 803.

*2.  The July 21, 1999, Press Release*

The July 21, 1999, press release was not a forward-looking statement and was therefore not protected under the safe harbor provisions of the PSLRA. We nevertheless hold that the plaintiff failed to state a claim regarding the July 21, 1999, press release. The press release in question announced that Champion's second quarter "earnings per share [] grew 13 percent to $0.59 from $0.52 last year." In the CAC, plaintiff quoted nearly all of the July 21 press release, much of which consists of statements that would qualify as forward-looking under the PSLRA. The district court, applying a test found in *Ivax* for mixed statements of present fact and future prediction, found the whole press release to be forward-looking. It also found that the July 21 press release was accompanied by meaningful cautionary language, and therefore concluded that the statements fit into the statutory safe harbor of the PSLRA and were not actionable.

Plaintiff contends that he took issue solely with the earnings figure included in the July 21 press release, and therefore argues that this is not a "forward-looking statement" protected by the PSLRA's safe harbor provision. Specifically, he argues that the district court misapplied *Ivax* in concluding that the entire press release should be treated as a "forward-looking statement." Plaintiff avers that the earnings figure given in the July 21 press release (and repeated in the August 9, 1999, Form 10-Q filed with the SEC) was recklessly misstated, because, under generally accepted accounting principles ("GAAP"), Champion was required to accrue a loss of approximately $18 million[12] in the second quarter of 1999 due to the probability of Parker Homes's bankruptcy, about which the defendants knew or should have known.

We agree with the plaintiff that the earnings figure statement in the July 21 press release is a statement of present or historical fact, and therefore not subject to the safe harbor provision of the PSLRA. We also agree with the plaintiff that the mixed scenario described in *Ivax* does not apply to this situation, and therefore that the district court erred in so holding. The mixed statement discussed in *Ivax* was a *list* of factors that would influence Ivax's third quarter results. The court there held that:

> The mixed nature of this statement raises the question whether the safe harbor benefits the entire statement or only parts of it. Of course, if any of the individual sentences describing known facts (such as the customer's bankruptcy) were allegedly false, we could easily conclude that that smaller, non-forward-looking statement falls outside the safe harbor. But the allegation

here is that the list *as a whole* misleads anyone reading it for an explanation of Ivax's projections, because the list omits the expectation of a goodwill writedown. If the allegation is that the whole list is misleading, then it makes no sense to slice the list into separate sentences. Rather, the list becomes a "statement" in the statutory sense, and a basis of liability, as a unit. It must therefore be either forward-looking or not forward-looking in its entirety.

182 F.3d at 806. The court in *Ivax* concluded that a *list* must be treated as a whole when the allegation was that the list itself misled investors by omitting certain relevant factors. The statement at issue here is not a list, nor is the argument that the earnings figure is misleading based on an omission from a list. The earnings figure is easily separable from the "forward-looking statements" contained in the press release, and is not given merely as an "assumption underlying" future projections. It therefore is not protected under the safe harbor provisions of the PSLRA, and the district court erred in so holding.

The question still remains whether the earnings figure was fraudulently misstated, which is dependent on whether the defendants recklessly failed to accrue an $18 million loss because of the possibility of Parker Homes's bankruptcy. For the reasons given below in discussing Champion's identical earning figure given in the August 9, 1999, Form 10-Q, there was no such reckless failure, and the plaintiff therefore failed to state a claim regarding the July 21, 1999, press release.

### 3. The July 21, 1999, Conference Call

The July 21, 1999, conference call contained a number of statements, some of which were forward-looking and some that were not, but because we find that none of the statements were made with sufficient scienter to amount to recklessness, we hold that the plaintiff failed to state a claim regarding

---

[12]This figure is made up of $10.4 million in discounts under the Bonus Program and $7.2 million in outstanding loans to Parker Homes under the Revolving Loan Agreement.

these statements. Champion held a conference call following the July 21, 1999, press release. Plaintiff asserts that several statements—or groups of statements on the same topic—made during this conference call were misleading to investors and were made with either recklessness or actual knowledge of their falsity. The first statement he cites is identical to one found in the July 21 press release:

> While our retail traffic remains healthy and we continue to keep our inventory levels under tight control, the biggest short-term challenge we face is to improve the industry's retail inventory excesses. Even though we anticipate that our retail sales should be strong for the remainder of the year, we expect that industry wholesale shipments could be down until this temporary adjustment is completed.

J.A. at 54. Plaintiff also cites some statements by Walter Young during the conference call, in which Young stated that Champion was "watching" and "managing" the inventory of its independent retailers. The final statements on this topic that plaintiff alleges were misleading are as follows:

> The overall industry outlook, the overall retail demand seems to be holding up very well. The positive impact of this overall demand impact is somewhat dissipated due to the growth in the number of retail outlets in the industry, which has outpaced the overall industry growth, over the last year or so. Therefore, total industry inventory has probably increased maybe a month or so, somewhere around 20,000 homes, industry wide.

J.A. at 397. The above statement was given by Walter Young at the opening of the conference call, and in response to a follow-up question on the topic, Young answered as follows:

> Again, there aren't any industry numbers as to turns that are really valid. So, it's—the Census Bureau comes out

> with some. There's plus or minus on that. So, the turn appears—and it changes because of the seasonal time of year. The industry turn has dropped below 2.5 time turns, from everything that we can see. So, it has gone down. That's why we think there may be a month of inventory, which would be about 20,000 homes in the industry, that should be excess and should be flushed through. Now, our inventory turns from our own organization . . . are somewhere a little under three times turn. . . . Our independents are about at the industry number, the best we can see, overall, that['s] the 3,500 independent retailers we sell to.

*Id*. at 400. Plaintiff argues that, given that Champion knew of Parker Homes's excess inventory, these statements were false because Champion was not actually keeping inventory under "tight control." He cites as evidence of the falsity of Young's statement three facts: "(1) [Champion's] forcing [Parker Homes] to take more inventory than it needed; (2) 100 other retailers supplied by Champion went bankrupt in 1999; and (3) Young's admissions that there was too much industry expansion because manufacturers got "carried away" when "greed overcame logic."[13] Pl. Br. at 41. Additionally, plaintiff contends that the statements are not forward-looking.

The district court found that the statements were forward-looking, in part because of its overly broad interpretation of mixed statements of present or historical fact and future projection under *Ivax*. The district court also held that the statements lacked meaningful cautionary language, and therefore were not protected under the first prong of the PSLRA's safe harbor provision, where scienter is not even considered. Nevertheless, because the statements were

---

[13]The phrase "greed overcame logic" was only alleged in the SASC, as is the evidence that Champion "forced" Parker Homes to take more inventory than needed.

forward-looking, under the second prong the PSLRA's safe harbor provision they would only be actionable if they were made with *actual knowledge* as to their falsity.  The district court did not reach this question, however, because it found that the plaintiff had not sufficiently alleged scienter with regard to *any* of the allegedly false statements in the CAC.  As discussed earlier, the district court erred in so finding.

We are not persuaded by the plaintiff's arguments with respect to these statements.  The statements are forward-looking in some respects, but they also contain numerous statements of present or historical fact, not all of which are simply assumptions underlying future projections.  But even under a recklessness standard, Walter Young and Champion were not misleading.  Certainly Champion and Walter Young professed to be monitoring inventory levels, both for their own retail stores and for their independent retailers.[14]  However, Young also explicitly stated that there was excess inventory in the market, partially due to the growth of retailers in the industry outpacing that of the overall industry growth.  In other words, Champion and Young *acknowledged* that there was excess inventory in the market, and that there was an excess of retailers in the market as well.

The evidence that the plaintiff cites to support his contentions is unavailing.  He asserts that Champion was "forcing [Parker Homes] to take more inventory than it needed."  Pl. Br. at 41.  We first note that the only real evidence of this is found in SASC, which, for reasons that will be discussed later in this opinion, the district court properly denied plaintiff's motion to file.  But even if we were to consider this evidence, it does not show that Young

---

[14]The first quoted section (from the press release) seems to state that Champion was keeping its *own* inventory under tight control, as opposed to that of independent retailers who would be the probable recipients of "industry wholesale shipments."

was speaking with such reckless disregard for the truth that his statements amount to "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Mansbach*, 598 F.2d at 1025.  Young admitted in the statements themselves that there was excess inventory in the market.  The fact that he underestimated the true extent of the excess—which it is doubtful that he knew or should have been aware of—does not mean that he was reckless when he stated that there was an inventory excess or when he said that they were "managing" and "watching" the inventory.

The next statement that the plaintiff says was misleading from the July 21, 1999, conference call was Young's response to a question of whether Champion was voluntarily repurchasing inventory from weaker retail dealers.  As plaintiff alleged in paragraph 38 of the CAC, "CEO Young responded that he could not be 'adamant enough' that Champion made no voluntary repurchases and that repurchases were limited to Champion's repurchase obligations to third party floor finance lenders when a retailer when bankrupt."  When asked if any of the dealers had gone bankrupt, Young responded: "I think one or two out of 3,500 across the country.  There have been some.  But . . . under the repurchase obligation . . . out of 70,000 homes that we build a year, I think we took back 100-110 homes last year . . . ."  *Id.*

The plaintiff, defendants, and the district court all agree that these are statements of present or historical fact, and therefore not entitled to protection under the safe harbor provision of the PSLRA.  The district court did not discuss these statements further, however, finding that they were not sufficiently linked to allegations of scienter.  Plaintiff contends that these statements were reckless and misleading given that in August, Champion chose to repurchase an additional $10 million of Parker Homes inventory beyond the $69 million which it was obligated to purchase, that the day after the conference call Parker Homes filed for bankruptcy,

and that approximately 100 other retailers supplied by Champion also declared bankruptcy sometime in 1999.

The evidence does not support a strong inference that Young's statements with regard to repurchases were recklessly made. Simply because Champion later made a business judgment that it should voluntarily repurchase inventory does not make it reckless to state that Champion does not make such repurchases as a general matter. Even if the negotiations to purchase Parker Homes inventory were ongoing at this point, the plaintiff has not asserted facts that show Champion knew or should have known that the end result of such negotiations was that Champion would voluntarily repurchase inventory it was not obligated to. It is plausible to argue as the plaintiff does, but these facts do not give rise to a *strong inference* of recklessness by Young or Champion.

The statements with regard to bankruptcies raise a more difficult question. There is no contention by the plaintiff that the actual statement made by Young was materially inaccurate when made. Rather, plaintiff asserts that defendants recklessly minimized the risk of potential bankruptcies by referring to statistics from 1998. We agree with the plaintiff that it was somewhat disingenuous of the defendants to refer to the previous year's statistics given the possibility that Parker Homes would go bankrupt the next day, resulting in a far larger negative impact on Champion than that referred to from the 1998 figures. Nevertheless, many of the plaintiff's allegations also show that Champion was under the impression that it had reached a deal that would keep Parker Homes out of bankruptcy. Champion and Young were placed in the difficult position of either disclosing that Parker Homes might go bankrupt the next day, which would lead to a significant drop in Champion's stock price that day and potentially harm their ability to finalize the deal to keep Parker Homes out of bankruptcy (and if they did keep Parker Homes out of bankruptcy, have Champion's stock price shoot

back up the next day), or not disclosing the Parker Homes situation, which, if it blew up in their faces (as it did), could lead to significant negative consequences, as well as open them up to suits. Given the circumstances, it is difficult to say that the defendants' statements were "an extreme departure from the standards of ordinary care." *Mansbach*, 598 F.2d at 1025. Faced with a tough decision, defendants made a choice that ultimately proved to be erroneous, but there is no "strong inference" of recklessness.

Plaintiff's claim regarding 100 other retailers that allegedly went bankrupt in 1999 does not make these statements reckless. There is no indication that any of these other dealers had gone bankrupt as of July 21, 1999; if anything, the facts asserted seem to imply the opposite. What this allegation does seem to show is that 100 other businesses in the manufactured housing industry also had not yet realized the extent to which retail inventory had outpaced industry and market growth. Champion and Parker Homes, along with 100 other dealers, seem to have been caught off guard by an unexpected decline in the manufactured homes market. This does not support a strong inference of recklessness by the defendants in making these statements.

Plaintiff, citing *Vencor*, also alleges that defendants, since they chose to issue a press release and hold a conference call on July 21, were obligated to tell the truth about Parker Homes's possible bankruptcy and give full disclosure. In *Vencor*, this court stated that "with regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths." 251 F.3d at 561. The plaintiff's assertion goes beyond the *Vencor* requirement. Just because defendants issued a press release and held a conference call to discuss their second quarter earnings does not mean that they chose to speak on any situation that could possibly affect their financial condition. Such a rule would require almost

unlimited disclosure on any conceivable topic related to an issuer's financial condition whenever an issuer released any kind of financial data. Additionally, the other topics discussed during the conference call were not things that *defendants* chose to discuss. They were asked questions by investors about repurchase obligations and bankruptcies, which it appears they endeavored to answer truthfully as to the current state of affairs. Furthermore, they studiously avoided speaking about future events. *Vencor* does not require more disclosure in such a situation.

In short, we find that these asserted facts do not imply *reckless* conduct on the part of Champion or Walter Young. They may not have been as careful as they could have been, but the asserted facts do not give rise to a strong inference that the defendants, in making these statements, displayed highly unreasonable conduct which is an extreme departure from the standards of ordinary care. *See* 15 U.S.C. § 78u-4(b)(2); *Mansbach*, 598 F.2d at 1025.

### 4. The July 30, 1999, Press Release and Conference Call

The July 30, 1999, press release and conference call contained a number of statements, all of which were statements of present or historical fact, but since we find that none of the statements were made with sufficient scienter to amount to recklessness, we hold that the plaintiff failed to state a claim regarding these statements. Champion issued a press release on July 30, 1999, in which it stated that the Parker Homes bankruptcy was "not anticipated." Young reiterated this point in a conference call later that day:

> We are the virtual exclusive supplier to Ted Parker Homes. This Chapter 11 filing, which we totally—was unanticipated by us . . . . [W]e are certainly supporting Ted Parker Home Sales in its Chapter 11 situation that it has taken on, we will support it as a supplier and as a creditor where we are, and we certainly hope that they

can continue to operate through Chapter 11 and eventually come out of it.

J.A. at 62-63, 429-30. Following these statements Young went on to describe Champion's plans to use its own retail organization to move into the void left by Parker Homes's bankruptcy, as well as to sell the inventory that it would be obligated to repurchase. Among the numerous questions during the teleconference, one questioner asked whether Champion could explain the kind of financial information that Champion received regularly from large independent retailers, including Parker Homes, to which Champion responded:

> [Chief Financial Officer Stegmayer:] [T]hat information varies depending on the relationship and retailer. . . . Financial information does not necessarily have to be provided by them, and then there's always the question of reliability on private financial statements. What we do, instead, is we try to track inventory to inventory turns, and monitor our liability with our retailer in that form, and we keep close tabs on the contingent liability we have with each of our retailers . . . .

> [Young:] . . . We had all impression the financials were going well. You know, we don't have an operational understanding here, but this organization continued to grow and expand, and with its new ownership here we had all impressions that it was valid regardless of the financial statements . . . .

J.A. at 432-33.

Walter Young and another Champion employee also responded to a question dealing with the circumstances leading up to Parker Homes's bankruptcy:

> [Young:] We have been working with Ted Parker over the years and part of his expansion working with him,

and positive [sic]. But we never—I mean, we have not really been getting operating statements or the financial aspects, so let me—we have been watching their inventory turn which is, with their unique operation,[15] always [unintelligible]. We have, over the, you know, over the last few—with the change of management it [sic] . . . .

[Chief Operating Officer Surles:] . . . [W]e had obviously been watching their inventories, and they have been a high expansion company, but as recent as a couple of months, the management had come to us and informed us that they were going into an inventory reduction mode and it might affect some of our plants, and so we suddenly reduced production at our Maxton, North Carolina, plant to compensate for that, and even though we're not—weren't excited about the profits and loss there, we were excited about their attitude in reducing inventories, and so we felt comfortable.

J.A. at 440. When asked if this occurred in approximately May or April, Young responded: "Mmm–hmm. And so that's why it so surprised us of the decision to go Chapter 11." *Id*. Young was then asked about Champion's discussions with Parker Homes since the Chapter 11 filing, to which Young responded: "With the decision to go Chapter 11 we've had ongoing discussions and to add the color background to them I don't think would be productive, probably not legal . . . ." *Id*.

Another Champion employee, when asked about Parker Homes's future and Chapter 11, answered: "[W]e can't speak for them and [debtor-in-possession] financing, whatever, they

---

[15]To another question, Young explained that "it was a unique retail model. [Parker Homes] believed in high inventories and selling . . . ." J.A. at 441.

might be preparing, we're not inside on that track. I mean, we're sitting here as outside creditors as any other creditor would be, so we really don't know."

In response to a later question asking whether Champion had any plans to buy Parker Homes out of bankruptcy, Young answered that

we've considered all options as far as the way to do it that led us to this announcement today. And, you know, we've bought many good retailers . . . but when it went to Chapter 11 it changes the nature of things, okay? . . . Now I have to say in going forward, you know, if Ted Parker Sales goes to another—we'll always consider all options at all time[s] . . . okay?

J.A. at 436. Finally, when asked whether Champion's plan with respect to Parker Homes might change if Parker Homes filed a Chapter 7 petition, Young responded:

Well, that's some of the issue. It is in Chapter 11, and we do not know, so we're flying blind too. That's why the nature of this thing and rather than—you know, we'll be flexible whatever happens. . . . And as you say, there is a difference as to having Chapter 11 or the various chapters, but we're flexible to react to whatever accordingly.

J.A. at 446.

The district court found that the statement in the July 30, 1999, press release that Parker Homes's bankruptcy was "not anticipated" was a statement of present or historical fact, and therefore that the scienter required was recklessness. The district also found, applying *Ivax*, that the general import of the July 30, 1999, conference call was forward-looking, although there was not meaningful cautionary language, and therefore all the statements in that conference call required the

scienter of actual knowledge. The district court did not look further into the issue, however, as it found that scienter was not sufficiently alleged in the CAC. As stated previously, the district court erred both in its application of *Ivax* and in concluding that scienter was not sufficiently alleged in the CAC.

Plaintiff alleges that these statements were at least recklessly false or misleading in several ways. First, plaintiff contends that the statements characterized Parker Homes's bankruptcy filing as unanticipated and indicated that Champion was unaware of Parker Homes's financial situation, when in fact Champion had been making strenuous efforts to save Parker Homes from bankruptcy. He also claims that these statements were at least recklessly misleading in that they imply that Champion was uninformed about Parker Homes's reorganization plans, when Champion was in fact engaged in discussions with Parker Homes and the bankruptcy court to buy out Parker Homes. Lastly, plaintiff asserts that these statements rejected suggestions that Champion purchase a large number of Parker Homes's sales lots, when in fact it had plans to do so and in fact did later purchase them.

Once again, we find these arguments, although plausible, to be insufficient to support a strong inference of recklessness by the defendants. Young's statements about Parker Homes's bankruptcy were statements of present or historical fact, and therefore recklessness with respect to their misleading nature is required. These comments were perhaps misleading, but the evidence does not support a strong inference of recklessness by the defendants with regard to their misleading nature. The bankruptcy certainly was not entirely unanticipated, yet there is also a fairly strong indication that Champion thought it had struck a deal to prevent the Chapter 11 filing. This will be discussed more in the next section.

As to the statements with regard to Parker Homes's financial situation, they also are statements of present or historical fact, and therefore recklessness is the state of mind required. These statements could also be somewhat misleading, but they are not so obviously misleading as to be reckless. The asserted facts are apparently consistent with the defendants' belief that Parker Homes was financially sound, at least up until a few months before the bankruptcy. Ostensibly, the defendants thought that although Parker Homes had a unique business plan that called for higher inventory, it was still in decent shape financially, especially considering that it had just recently been purchased by new owners that invested heavily in the company. A potential investor in Champion could have, however, interpreted these statements to mean that the defendants believed that Parker Homes's financial situation was good all the way up to the bankruptcy declaration, when the defendants knew that Parker Homes was, at a minimum, suffering some financial difficulties such that it needed some emergency funding, even if only temporarily. Although this is a plausible understanding of those statements, it is no more compelling than the previous interpretation advanced above. Therefore, plaintiff's allegations with regard to those statements do not raise the strong inference of recklessness required by the PSLRA.

Plaintiff also does not adequately assert that the defendants were knowingly or recklessly misleading in their statements concerning their present contacts and future plans with Parker Homes in bankruptcy. Some of these statements are of present or historical fact, while other are forward-looking, and therefore different standards apply. Plaintiff's argument is unconvincing regardless of the standard applied, as the evidence does not show that the statements were made even recklessly. Young explicitly stated in the conference call that Champion was engaging in ongoing discussions with Parker Homes now that it was in Chapter 11. Admittedly, Young and another Champion employee also stated that Champion

was "not inside on that track" and "flying blind," but these statements must be taken in light of the other comments confirming that they were engaging in discussions with Parker Homes since the Chapter 11 filing. Additionally, although Champion employees had stated that Champion currently had other plans for how it was going to relate to Parker Homes and how it was going to handle the repurchased inventory, the employees also stated very explicitly that they were "flexible" and would consider "all options" with respect to Parker Homes. However, the employees didn't want to say too much because they were unsure of how the Chapter 11 filing would affect all these issues. These statements by the defendants are not significantly misleading, much less made with a reckless disregard for the truth.

Under the heightened pleading requirements of the PSLRA, only allegations that give rise to *strong* inference of scienter will survive a motion to dismiss. 15 U.S.C. § 78u-4(b)(2). The allegations advanced by the plaintiff in this case do not give a sufficiently strong inference of recklessness with regard to the July 30, 1999, statements discussed above to survive such a motion.

Plaintiff also asserts that defendants were recklessly misleading in the July 30 conference call when they made statements about the nature of the $33.6 million charge Champion planned to take during the third quarter of 1999. Specifically, plaintiff takes issue with the following statement:

On the component question, the pre-tax is 33.6 million. And in there—here, I'm not going to break it apart for you and I'll tell you why. Primarily it's because of the discounting when we're required to take the homes back, what we may have to sell them for, and I don't want to say any percentage. We had to make that assumption obviously, what that is, because I don't want to negotiate

with potential retailers of what those prices might be and it can only be worse. But that's, by far, the majority of this charge . . . . The other piece of it, the plant closing, is some of the costs of the opening of our retail, some of the actual physical moving is—you know, the physical moving of relocating these homes and, again, since they're environmental, but that's probably less than 15 percent of this total charge.

J.A. at 431. Plaintiff argues that this statement was recklessly misleading because it represents that the majority of the charge was related to future discounts necessary to resell the homes, when defendants actually knew that a large percentage of the charge was to write-off secret loans and undisclosed discounts.

We begin our analysis with whether this statement qualifies for protection under the safe harbor provision of the PSLRA. This statement is not forward-looking, as it is describing the components of a present charge that Champion has decided to take due to Parker Homes's bankruptcy. Even if some of the components are somewhat uncertain and dependent on future events, it nevertheless describes Champion's present calculation. Therefore, the scienter required with regard to this statement is recklessness.

Plaintiff's argument with respect to the statement about the $33.6 million charge is unavailing. Although *Vencor* requires that when an issuer reveals information it has no duty to disclose, it cannot give half-truths, in this case Walter Young explicitly and repeatedly stated that he was not revealing all the details of the charge. In other words, Young's statement was not recklessly misleading, because he told the investors that he was not "going to break it apart" and he didn't "want to say any percentage," but instead only gave them a rough sketch. Although the statement might have been somewhat misleading, it was not so obviously so as to be reckless. Accordingly, we find that these facts do not give rise to the

strong inference of recklessness that the PSLRA requires. *See* 15 U.S.C. § 78u-4(b)(2).

5. *The August 9, 1999, Form 10-Q*

The August 9, 1999, Form 10-Q did not recklessly violate generally accepted accounting principles ("GAAP"), and therefore we hold that the plaintiff failed to state a claim regarding this filing. The plaintiff contends that Champion's second quarter Form 10-Q recklessly violated GAAP because Champion was required by those accounting principles to accrue at least $18 million as a loss on the outstanding loans and volume discounts owed by Parker Homes to Champion. He further avers that the footnote disclosure that Champion did make was insufficient under GAAP. The district court dismissed this claim because it insufficiently alleged scienter, because the court found that Champion was not required to accrue the loss in the second quarter, and because the footnote disclosure satisfied GAAP.

Plaintiff bases his argument on Financial Accounting Standard ("FAS") No. 5, which requires a company to accrue an estimated loss if two conditions are met:

a.   Information available prior to the issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b.   The amount of the loss can be reasonably estimated.

J.A. at 60. The "date of the financial statements" is the last day of the accounting period for which the financial statements are presented, which in this case was the end of the second quarter: July 3, 1999. Plaintiff's argument is that,

given the probability of Parker Homes's bankruptcy and defendants' knowledge thereof prior to July 3, 1999, Champion was required to accrue at least $18 million in probable losses due to Parker Homes's bankruptcy on its second quarter Form 10-Q released on August 9, 1999.

In order for us to judge the merits of the plaintiff's claim, we need to be able to answer two questions with regard to "probability." First, we need to know what the word "probable" means in FAS No. 5. In other words, we need to know how probable the contingency needs to be for a company to be required to accrue a loss in the financial statements. There is no guidance in the record on how to answer this question. Second, we need to know how probable Parker Homes's bankruptcy actually was, a contingency that is hard to assess after the fact.[16]

It is difficult now, in retrospect, to assert that these probabilities were such that it was reckless for the defendants to decide not to disclose more information or to accrue the $18 million loss in the second quarter of 1999. It is certainly a plausible inference that it was reckless. But the opposite is also a plausible inference—that defendants thought they had avoided the bankruptcy, were not sure if they would be able to purchase Parker Homes's assets in the bankruptcy

---

[16]In fact, much of the plaintiff's argument in this case depends upon probability: the probability of the bankruptcy, as well as the probability, after the bankruptcy, that Champion would be able to buy all of Parker Homes's assets during the bankruptcy proceedings. The plaintiff is aided by hindsight, which reveals that the probability of both these events was high, but this was not nearly as certain in advance. In substance, therefore, the plaintiff wishes for the court to accept that Champion's attempts to prevent Parker Homes from having to enter into Chapter 11 were almost certainly doomed to fail, while likewise asserting that Champion's negotiation with Parker Homes to purchase its assets in the bankruptcy court proceedings were a *fait accompli*. Thus, according to the plaintiff, defendants were reckless because they did not properly weigh the probability that these things would occur.

proceedings, and in general were not aware of the economic downturn that was about to hit the manufactured housing market. After the Holding Companies declared bankruptcy on June 28, 1999, Champion engaged in discussions with GE Partners and Ardhouse to continue to provide funding to Parker Homes. These discussions resulted in a Letter of Intent on July 15, 1999, in which GE Partners and Champion agreed to provide the funding. Pursuant to this Letter of Intent, Champion made an unsecured loan of $350,000 to Parker Homes on July 16, 1999. Furthermore, as Ted Parker alleged in his complaint against GE Partners and Ardhouse,

> At the time such bankruptcy proceedings were filed, T. Parker had conducted telephone negotiations with senior management at GE [Partners] to help structure a continued operating plan for [Parker Homes]. T. Parker had agree to transfer . . . a significant portion of his stock in [Parker Homes] to the Defendants and Champion for their input of additional capital into [Parker Homes], which would have allowed the continued operation of [Parker Homes]. T. Parker and Champion believed that such an agreement was in place and then learned the next day that the Defendants had unnecessarily and with improper motivation placed [Parker Homes] into bankruptcy.

J.A. at 106. It is at least plausible based on these facts that the defendants had good reason to believe that the loans to Parker Homes were not impaired because they had come to an agreement whereby Parker Homes would be able to avoid Chapter 11. It also appears implausible that defendants would have continued to advance *unsecured* loans of $2.25 million[17] and $350,000 to Parker Homes if they had known that Parker Homes was going to file a Chapter 11 petition.

---

[17]The detailed allegations surrounding this loan are found only in the SASC.

Additionally, when it did become clear that the loans and discount money were impaired—after Parker Homes was put into bankruptcy—Champion did take the proper steps under GAAP. Since the bankruptcy occurred after the closing of the second quarter on July 3, 1999, and the defendants ostensibly had good reasons to think—at least until after July 3—that they would be able to prevent Parker Homes's bankruptcy, they were arguably not required to accrue the loss during the second quarter. Instead, Champion followed the instructions in GAAP and FAS No. 5 which provide that, if information becomes available indicating that it is probable that an asset became impaired after the date of the financial statements—July 3, 1999—but before the statements were filed on August 9, 1999, the financial statements should disclose the nature and estimated amount of the loss, but the loss should not be accrued in those financial statements. This is what Champion did in its August 9, 1999, Form 10-Q, footnote 11.

Both outcomes in this situation—bankruptcy or avoidance of bankruptcy—appear to be somewhat probable, and FAS No. 5 does not specify the level of probability required to accrue a loss. Given two fairly plausible explanations of the facts, we find it difficult to say that plaintiff's facts give rise to a *strong inference* of scienter, that plaintiff's explanation is the "most plausible of competing inferences." *Vencor*, 251 F.3d at 553. We also find it difficult to say that, given the level of knowledge that defendants had of Parker Homes's financial situation, Champion's actions in not accruing the $18 million loss in the second quarter of 1999 were an "extreme departure from the standards of ordinary care." *Mansbach*, 598 F.2d at 1025.

Plaintiff's reliance on the similarities between the passage of the Balanced Budget Act in *Vencor* and Parker Homes's bankruptcy in this case is misplaced. In *Vencor*, the passage of the Balanced Budget Act was a contingency outside the defendants' control that was virtually certain to have a

negative impact on the defendants. *See* 251 F.3d at 556-58. Therefore, we held that there was a strong inference that defendants were reckless when they released favorable earnings projections after they knew that the Balanced Budget Act was going to have a negative impact on those earnings, and did not give adequate disclaimers about the possible effects of the Act. *Id*. at 566. In this case, the contingency that could have a negative impact on defendants was *not* outside defendants' control, and it appears at least plausible that defendants reasonably believed that they had prevented that contingency from taking place. *Vencor* is also distinguishable from the present case in that there is no indication in the present case that the defendants profited from their allegedly misleading statements. Unlike the defendants in *Vencor*, there is no allegation in the present case that the defendants undertook any insider trading—or any other means to profit—that might have led them to attempt to conceal Parker Homes's bankruptcy during this period. *Cf. Vencor*, 251 F.3d at 558.

In short, we do not believe that the plaintiff has pleaded sufficient facts to give rise to the *strong* inference of scienter that is required under the PSLRA. *See* 15 U.S.C. § 78u-4(b)(2). The evidence does not show that defendants acted with an extreme disregard for the standard of ordinary care in making these statements. *See Mansbach*, 598 F.2d at 1025.

**E. The District Court Did Not Err in Denying Plaintiff's Motion for Leave to File the SASC**[18]

The district court moreover did not err in denying the plaintiff's motion for leave to file the SASC. The district court denied plaintiff leave to file the SASC on two grounds.

---

[18]This motion has been variously described as a motion to amend and as motion for leave to file an amended complaint. They are in substance the same motion.

First, the district court held that the amendments provided in the SASC were futile. Second, the district court held that allowing the repeated filing of amended complaints would frustrate the purpose of the PSLRA.

As a general matter, leave to amend "should be freely given when justice so requires." Fed. R. Civ. P. 15(a). And "[i]n the securities litigation context, leave to amend is particularly appropriate where the complaint does not allege fraud with particularity." *Morse*, 290 F.3d at 800. Denial of leave to amend may nonetheless be appropriate "where there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Id*. (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The district court held that amendment of the CAC with the SASC would be futile because the SASC did not better link the allegations of scienter with any specific misstatements or omissions. We have already stated that the district court erred in so holding. As we stated in *Morse*, "[i]n the securities litigation context, leave to amend is particularly appropriate where the complaint does not allege fraud with particularity." 290 F.3d at 800. However, we nonetheless agree with the district court that the facts alleged in the SASC do not give rise to the strong inference of scienter required under the PSLRA, and therefore are futile. *See Morse*, 290 F.3d at 800. The additional facts alleged in the SASC strengthen the inference that the defendants had some indication that Parker Homes had surplus inventory and was going through some financial difficulties in the spring of 1999. The SASC also alleges that the defendants knew that Parker Homes's bankruptcy was likely because Ted Parker had sent out notices of default on Parker Homes's sales lot lease agreements, which were Parker Homes's only unencumbered asset. However, as the plaintiff also alleged, the defendants

expressly disclosed that they believed there was excess inventory in the market as well as their knowledge that Parker Homes had excess inventory, which the defendants believed to be due to Parker Homes's unique business plan. As the facts alleged by the plaintiff also imply, there is at least a plausible inference that the defendants believed they had averted the Parker Homes bankruptcy. The additional allegations in the SASC thus do not give rise to the strong inference of recklessness required under the PSLRA, and are therefore futile.

The district court also correctly held that allowing repeated filing of amended complaints would frustrate the purpose of the PSLRA. To come to this conclusion, the district court first had to decide whether the PSLRA restricts Rule 15(a) of the Federal Rules of Civil Procedure. Rule 15(a) provides that "[a] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave should be freely given when justice so requires." The PSLRA, on the other hand, states that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements . . . are not met." 15 U.S.C. § 78u-4(b)(3)(A). The district court found that the purpose of the PSLRA's heightened pleading requirements and stay of discovery were to prevent "harassing strike suits filed the moment a company's stock price falls," and concluded that the PSLRA "could not achieve this purpose if plaintiffs were allowed to amend and amend until they got it right." Since the plaintiff failed to meet the pleading requirements, the district court concluded that in order to enforce the purpose of the PSLRA, it must dismiss the CAC with prejudice.

Plaintiff cites several district court opinions that allowed for repeated amendments to complaints despite motions to dismiss by the defendants. *See In re Livent, Inc. Noteholders Sec. Lit.*, 174 F. Supp. 2d 144, 148 (S.D.N.Y. 2001) (third amended complaint); *McNamara v. Bre-X Minerals, Ltd.*, 197

F. Supp. 2d 622 (E.D. Tex. 2001) (fourth amended complaint); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 844 & n.14 (N.D. Ill. 2000) (sixth amended complaint); *In re Southern Pac. Funding Corp. Sec. Lit.*, 83 F. Supp. 2d 1172, 1174 (D. Or. 1999) (fourth amended complaint). He also cites a Third Circuit case that allowed amendment despite the PSLRA, even after the final judgment:

> Although we are reluctant to allow amendment of a pleading at this stage of the proceedings, the plaintiffs were precluded from engaging in discovery in the District Court. Without discovery, plaintiffs had no way to obtain the meeting minutes other than by happenstance. We will not add to the strict discovery restrictions in the Private Securities Litigation Reform Act ("PSLRA") by narrowly construing Rule 15 in this case, even at this late stage in the litigation. Given the high burdens the PSLRA placed on plaintiffs, justice and fairness require that the plaintiffs before us be allowed an opportunity to amend their complaint to include allegations relating to the newly discovered Board meeting minutes.

*Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001). *Werner* is the most persuasive authority for requiring the district court to allow an amended pleading.

While the *Werner* opinion had not been issued at the time of the district court's denial of the motion to permit an amended complaint, the district court nonetheless responded to a similar argument by plaintiff:

> In this case, it appears that plaintiffs are contending that since discovery procedures are not available to them, that a court must be lenient in allowing amendments to pleadings. Contending that Rule 15 permits this, they purposely seek to circumvent the [PSLRA's] strict requirements preventing discovery. But this is precisely

the device that Congress intended to be used, i.e., to prevent suits in which a foundation for the suit can not be pleaded.

The stay of discovery and the heightened pleading standards are separate and distinct, yet complimentary mechanisms. The stay of discovery operates to prevent plaintiffs with baseless claims from squeezing a nuisance settlement from an innocent defendant. The pleading requirement is more than simply a line the plaintiffs must cross to set to discovery; it is the heart of the [PSLRA]. This stringent requirement operates to discourage baseless suits altogether. It evinces Congress's acknowledgment of the burden an allegation of securities fraud places on the innocent defendant even without discovery. The [PSLRA] requires a uniform pleading standard; this standard is meaningless if judges on a case-by-case basis grant leave to amend numerous times.

Since *Werner* was decided, the Third Circuit has specifically endorsed this reasoning, quoting with approval District Judge Reed's reliance upon the district court's opinion in this case:

The PSLRA's stay of discovery procedures was intended by Congress to protect innocent defendants from having to pay nuisance settlements in securities fraud actions in which a foundation for the suit cannot be pleaded; rather than lead to the conclusion that plaintiffs should receive more leniency in amending their pleadings, the stay of discovery procedures adopted in conjunction with the heightened pleading standards under the PSLRA is a reflection of the objective of Congress "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." [*Champion Enters.*, 145 F.Supp.2d] at 874 (quoting Selected Bill Provisions of the Conference Report to H.R. 1058/§ 240, 141 Cong. Rec. § 19152 (daily ed. Dec. 22, 1995)). This objective would be thwarted if, considering the history of this case,

plaintiffs were liberally permitted leave to amend again; this is particularly true where, as here, there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA.

*In re Nahc, Inc. Sec. Litig.*, 306 F.3d 1314, 1332-333 (3d Cir. 2002) (quoting *In re Nahc, Inc. Sec. Litig.*, No. 00-4020, 2001 U.S. Dist. LEXIS 16754, at *81-82 (E.D. Pa. Oct. 17, 2001)). While it is true that the Third Circuit was reviewing its district court's decision only for abuse of discretion,[19] it is clear that it was giving its approval to the district court's *legal* interpretation of the PSLRA, an interpretation that is subject to *de novo* review.

Plaintiff also contended during oral argument that our recent holding in *Morse*, 290 F.3d 795, requires a reversal of the district court's decision denying plaintiff further leave to amend his complaint. In *Morse* we held that, despite the plaintiffs' "gamesmanship" in failing to amend their complaint, the plaintiffs' actions did not amount to bad faith and the delay alone did not justify denial of leave to amend. 290 F.3d at 800. Additionally, in that case it did not appear that the defendants would be prejudiced by allowing further amendment. *Id.* at 800-01. Notably however, in *Morse* there was no discussion of the heightened pleading requirements of the PSLRA, or even of the PSLRA generally. In light of those requirements, we think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure. *Morse* is also distinguishable from the present case in that there was no

---

[19]This appears to be due to some discrepancy on the standard of review applied to the denial of a motion to amend between the Third and the Sixth Circuits.

finding in that case that amendment would be futile, while in this case allowing the plaintiff to file the SASC would not overcome the inadequacies of the CAC. We therefore find that our holding in *Morse* does not dispose of the issue at hand.

We agree with the district court that the purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA. We also agree, although on other grounds, that the proposed amendments in the SASC would be futile. The district court was within its discretion in refusing the plaintiff leave to file the SASC, and in light of our holding that filing of the SASC would be futile—although on alternative grounds than those found by the district court—we AFFIRM the judgment of the district court dismissing this case.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court dismissing this case.